## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| FERRELL COMPANIES, INC., as Plan Sponsor and Plan Administrator of the Ferrell Companies, Inc. Employee Stock Ownership Plan, 700 College Blvd., Suite 100 Overland Park, Kansas 66210 | ) ) ) ) ) ) ) ) ) | CASE NO. |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| GREATBANC TRUST COMPANY, 801 Warrenville Road, Suite 500 Lisle, Illinois 60532 | ) ) ) ) | |
| -and- | ) ) | |
| HOULIHAN LOKEY CAPITAL, INC. 10250 Constellation Blvd., 5th Floor Los Angeles, California, 90067 | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### COMPLAINT

Ferrell Companies, Inc. ("Ferrell Companies"), in its capacities as Plan Sponsor and Plan

Administrator of the Ferrell Companies, Inc. Employee Stock Ownership Plan (the "Plan"), makes

this Complaint against the Plan's former trustee, GreatBanc Trust Company ("GreatBanc"), and

against global investment bank Houlihan Lokey Capital, Inc. ("Houlihan Lokey").

# INTRODUCTION

This case arises out of the improper efforts of a cadre of powerful banks, investment firms, hedge funds, and their advisors to effectuate a secret and contractually prohibited hostile takeover of Ferrell Companies and enrich themselves at the expense of thousands of Ferrellgas[1] employee-owners.  Shockingly, GreatBanc, the former Directed Trustee and fiduciary of the Ferrellgas employee ownership plan, was at the center of these schemes, a willing participant in the efforts to destroy the value held by the almost 5,000 employee-owners it was entrusted to protect.  Greed among financial players is nothing new.  But what happened here is different in how GreatBanc willingly participated and allowed itself to be used as a conduit for predatory actors to attempt to take over Ferrellgas in violation of GreatBanc's contractual and fiduciary duties.  In allowing itself to be so used, GreatBanc breached its contractual obligation to work solely on behalf of the company's employee-owners and at the direction of Ferrell Companies' Board of Directors and breached its fiduciary duties to the employee-Plan participants.

GreatBanc itself understood full well the reason for Ferrellgas' financially challenged position that ostensibly precipitated GreatBanc's improper activist efforts to take over the company.  In June 2015, under now-replaced management, Ferrellgas acquired Bridger Logistics LLC ("Bridger"), a midstream energy transportation company, and its subsidiaries for approximately $820 million.  Ferrellgas entered into a special engagement with GreatBanc

---

[1] While the enterprise is commonly known as "Ferrellgas," there are multiple corporate entities that fall under that name, which entities are all separate and distinct.  Ferrell Companies is 100% owned by the Plan's Ferrell Companies Inc. Employee Stock Ownership Trust (the "Trust").  Ferrell Companies, in turn, is the 100% owner of Ferrellgas, Inc. ("General Partner" or "FGI").  General Partner is the general partner of both Ferrellgas Partners, L.P. ("FGP"), a publicly traded master limited partnership, and FGP's subsidiary, Ferrellgas, L.P. ("OpCo").  Ferrell Companies is also the owner of approximately 23% of the limited partnership units of FGP.  FGP owns 99% of the limited partnership interests of OpCo.  Collectively, these entities are referred to as "Ferrellgas."

(beyond the scope of its Directed Trustee role and duties) for GreatBanc to evaluate and exercise its "fiduciary judgment" with respect to the Bridger transaction, and studied that transaction. Within a year, however, Bridger failed, and Ferrellgas ultimately was forced to take an $800 million write-down – the event that put Ferrellgas in the precarious financial position it found itself in in 2018-2019.  To protect its own hide, at the expense of Ferrellgas' employees, GreatBanc was therefore motivated to participate in the hostile takeover efforts of third parties (and preserve its role as Directed Trustee) to avoid liability for its role in the failed Bridger investment.

Also centrally involved in this scheme was global investment bank Houlihan Lokey.  In 2018, Houlihan Lokey was in the running to become a financial advisor to Ferrellgas in connection with a possible financial restructuring – again, necessitated by the failed Bridger transaction.  Such an engagement would have netted Houlihan Lokey considerable fees, and Houlihan Lokey entered into a Confidentiality Agreement in August 2018, pledging to keep confidential "information concerning the Company and its businesses, prospects, and customers."  When Ferrellgas ultimately chose another advisor, however, Houlihan Lokey surreptitiously turned to GreatBanc in the hopes that GreatBanc would exert its influence with Ferrellgas and force a replacement or expansion of Board of Directors members favorably disposed to hiring Houlihan Lokey, or that GreatBanc would simply hire Houlihan Lokey itself, in violation of its confidentiality obligations to Ferrellgas.  Thus, Houlihan Lokey encouraged and provided GreatBanc assistance in trying to improperly interfere in Ferrellgas' business and operations.  In so doing, Houlihan Lokey knowingly and tortiously interfered with the contract (and fiduciary relationship) between Ferrellgas and GreatBanc, and acted in violation of its Confidentiality Agreement with Ferrellgas.

The defendants' plan unraveled, however, when Ferrell Companies (which did not yet have knowledge as to what defendants were planning) delivered a Notice of Removal to GreatBanc on

October 9, 2019, as Ferrell Companies was entitled to do under the governing Trust Agreement. Facing removal, GreatBanc declared that it would unilaterally replace the Ferrell Companies Board with new directors that it and Houlihan Lokey handpicked, without any legitimate basis or authority to do so, as this Court later held when Ferrellgas initiated litigation to stop GreatBanc.

This scheme did not end with GreatBanc and Houlihan Lokey.  It went well beyond, to other institutions that view the company and its employee-owners solely as mere cells on a spreadsheet — an avenue to make their pockets richer. The other players involved in this underhanded scheme include:

(i)     attempted acquirer Caligan Partners, whose desired takeover of the company was led by Ferrellgas' former CEO, CFO, and COO;

(ii)     certain of Ferrellgas' bondholders, as to whose bonds Ferrellgas has been in compliance in all regards;

(iii)    TPG Specialty Finance, Ferrellgas' senior secured lender who manufactured a technical default to extract additional fees from Ferrellgas;

(iv)    Ferrellgas' former counsel who advised Ferrellgas on its restructuring efforts in 2018 only to turn around and collaborate with GreatBanc and Houlihan Lokey in GreatBanc's efforts to effectuate a hostile takeover of the company (remarkably, this law firm then sent an invoice to Ferrellgas for the work related to the hostile takeover of Ferrellgas);

(v)     GreatBanc's attorneys, whose apparent appetite for fees led them to recklessly offer disastrous advice to GreatBanc that, if successful, would have triggered a default

under Ferrellgas' senior secured credit facility and likely precipitated a bankruptcy,[2] and

(vi)     Eddystone Rail Company, LLC, a subsidiary of Enbridge, Inc., that upon information and belief communicated with certain bondholders to ensure a recovery in a pending lawsuit (the resolution of which, regardless of its lack of merit, would only serve to further the interests of the bondholders and Eddystone), at the expense of the Ferrellgas' employee-owners.

These entities individually and collectively encouraged and/or aided GreatBanc in violating its duties to Ferrellgas to improperly take advantage of an overleveraged balance sheet that the company was, and is, actively working to resolve for the benefit of the companies, their stakeholders, and their employee-owners.

By materially assisting in this scheme, GreatBanc trampled on its contract with Ferrell Companies and betrayed the very people it was duty bound to protect – the Ferrellgas employee-owners.  That contract required GreatBanc to act with *prudence* and *only in the interest of the employee stockholders.*  It also explicitly limited GreatBanc's authority to act only *as directed by the Ferrell Companies Board.*  GreatBanc ignored these provisions and breached its duties, and Houlihan Lokey actively acted to procure GreatBanc's breach of contract and trust.

And this is where the story begins, with GreatBanc acknowledging for the first time during oral argument in this Court on its TRO motion to keep itself in place as the Directed Trustee, that had the Court granted its motion, Ferrellgas' debt would have been thrown into default, which

---

[2] TPG and Ferrellgas bondholders undoubtedly knew that their respective debt would be thrown into default by GreatBanc's hostile takeover efforts – a "change in control" – thus allowing them to exert remedies for their own financial gain if GreatBanc was successful in replacing Ferrell Companies' board of directors.

would have led to a complete collapse of the Ferrrellgas capital structure, and would have destroyed any and all value possessed by the employee-owners and Plan participants.

Fortunately for the employees and other innocent stakeholders, the scheme described in this Complaint failed.  But not before significant damage was done to Ferrell Companies.  This lawsuit seeks redress for those damages.

## PARTIES

1.      Ferrell Companies is a Kansas corporation with its headquarters and principal place of business in Overland Park, Kansas.  Among other things, Ferrell Companies and its affiliates, including FGI, FGP and OpCo,[3] are engaged in the marketing and sale of propane products throughout the United States.

2.      GreatBanc is an Illinois corporation with its principal place of business in Lisle, Illinois.

3.      Houlihan Lokey is a California corporation with its principal place of business in Los Angeles, California.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332, as this matter arises between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      Jurisdiction in this Court also is proper pursuant to 28 U.S.C. § 1331 as this action arises out of GreatBanc's breaches of its agreement to serve as a Directed Trustee of an employee stock ownership trust subject to the Employee Retirement Income Security Act of 1974, as

---

[3] *See supra* note 1.

amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), and Houlihan Lokey's tortious participation in effectuating those breaches.

6.      The Court has personal jurisdiction over GreatBanc and Houlihan Lokey, as the acts complained of occurred or were directed to Ferrell Companies and the Plan in this District. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to Ferrell Companies' claims occurred in this District.

## FACTS

### I.      Ferrell Companies, An Employee-Owned Company

7.      Ferrellgas' rise as a great American company began in 1965 when Jim Ferrell, after service in the U.S Army, returned home to help his father with his company, the A.C. Ferrell Butane Company.  At the time, the A.C. Ferrell Butane Gas Company, founded in 1939, was a local propane company with a single store in Atchison, Kansas, that was struggling financially. Jim Ferrell, over many years, grew the business from a single, insignificant, small store into a premier propane company with operations in 49 states.  Ferrellgas' Blue Rhino propane cylinder exchange business is the leading and most recognized propane brand in the nation with more than 55,000 locations in all 50 states and Puerto Rico.

8.      On August 1, 1996, Ferrell Companies established the Plan (Exhibit A), which gave employees the right to share in the ownership in Ferrell Companies through an Employee Stock Ownership Trust.  The Plan is administered by the Ferrell Companies as Plan Administrator, acting through the Ferrell Companies Board of Directors, which appoints a Plan Trustee to act at its direction.  This Directed Trustee technically elects the members of the Ferrell Companies Board, but per its contract (the Trust Agreement), the Directed Trustee may only vote its shares as the

Plan Administrator directs.  In other words, the Directed Trustee has no independent right or authority to change the composition of the Ferrell Companies Board.

9.      Ferrell Companies indirectly controls the Ferrellgas operating companies (FGP and OpCo) by virtue of its 100% ownership of their general partner, FGI.  *See supra* footnote 1. The Ferrell Companies Board elects the board of directors of FGI, which manages FGP and OpCo (as the General Partner of each) under the applicable limited partnership agreements.

## II.      GreatBanc Becomes Directed Trustee.

10.      On August 1, 1997, Ferrell Companies and LaSalle National Bank ("LaSalle") entered into an agreement (the "Trust Agreement") to appoint LaSalle as Directed Trustee of the Plan (Exhibit B).  The Plan and Trust Agreement collectively are referred to as the "ESOP."  When GreatBanc acquired LaSalle in 2005, GreatBanc became the successor trustee, and as such became bound by the Trust Agreement.

11.      Pursuant to the Trust Agreement and ERISA, GreatBanc was a "directed trustee," which means it could generally take actions only as directed by the Plan Administrator, Ferrell Companies, under the direction of its Board.  Section 2.2 of the Trust Agreement provides that "[t]he powers, duties and responsibilities of the Trustee shall be limited to those set forth in this Trust Agreement, and nothing contained in the Plan, either expressly or by implication, shall be deemed to impose any additional powers, duties or responsibilities on the Trustee."  Section 2.6 of the Trust Agreement similarly provides that "the Trustee shall have no authority to act unless directed by the Plan Administrator."  Thus, the Trust Agreement prohibits GreatBanc from making unilateral decisions with respect to most matters affecting the ESOP.  Among these is the decision to name or replace members of the Board.

12.     The Trust Agreement also provides that GreatBanc must act with prudence and solely in the interest of Plan Participants.  Section 2.5 of the Trust Agreement provides, among other things, that "[t]he Trustee shall discharge its duties hereunder solely in the interests of the Plan's Participants and other persons entitled to benefits under the Plan," and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

13.     The Trust Agreement gave GreatBanc no responsibility or authority with respect to the management or operations of FGP or OpCo.  Conversely, Section 6.2 of the Trust Agreement gave the Ferrell Companies Board the absolute right to remove and replace the Trustee upon advance notice and offering evidence that a successor Trustee has accepted the Trusteeship.  *See* Trust Agreement § 6.2.

## III.     The Bridger Acquisition

14.     In 2015, looking to diversify its revenue streams, Ferrellgas' then-management identified Bridger Logistics LLC ("Bridger") as an acquisition target.  Bridger was a midstream transportation company primarily engaged in shipping oil from the Bakken Formation in North Dakota to refineries on the East Coast.  Ferrellgas thought Bridger presented a good opportunity to diversify because of the strength of its business in the oil and gas industry and what the then-management believed and promoted as a low-risk contract structure.

15.     The price tag for the Bridger acquisition was $822 million.  As permitted by its Trustee Agreement with Ferrell Companies and at Ferrell Companies' request, GreatBanc acted as a discretionary trustee of the ESOP for a special assignment to assess the proposed Bridger transaction on behalf of the Plan Participants (Exhibit C).  In this special capacity as a

discretionary, rather than directed, trustee, GreatBanc was asked to independently assess the Bridger transaction exercising its own fiduciary judgment.  For these efforts, GreatBanc requested and was paid a fee of $500,000—ten times its annual compensation as Directed Trustee.  After conducting its own review and analysis, GreatBanc independently concluded that the Bridger acquisition was in the best interest of Plan Participants and approved it.

16.    The Bridger acquisition was financed by the sale of additional limited partnership interests in FGP and the issuance of FGP and OpCo bond debt that totaled over $500 million. Before agreeing to the financing arrangement, numerous financial institutions, including the underwriter of the bond debt, conducted their own diligence and concluded the financing of the acquisition was sound.

17.    After closing the Bridger acquisition and incurring the acquisition-related debt, a confluence of factors resulted in Bridger's failure.  Eventually, without the expected revenue from Bridger, Ferrellgas struggled financially, causing a need to restructure the debt associated with the Bridger acquisition.  Ferrellgas addressed these challenges in a variety of ways. Among other things, Jim Ferrell, who had retired from leading the company after the creation of the ESOP, was asked to return to the helm as Interim CEO.

## IV.    GreatBanc Shifts From Directed Trustee to Activist, With Houlihan Lokey's Active But Surreptitious Assistance.

18.    As new management worked with the Board on solutions to remedy Ferrellgas' debt burden, GreatBanc, fearing as to its liability in connection with the Bridger acquisition, began to interfere.  To that end, GreatBanc collaborated with ousted Ferrellgas CFO, Ryan VanWinkle, and ousted Ferrellgas COO, Boyd McGathey, both terminated in 2015.[4]   VanWinkle and

---

[4] Their actions violated the Agreements they signed when they left Ferrellgas which prohibited them from, among other things, disclosing confidential information about Ferrellgas,

McGathey represented a group of buyers who saw an opportunity to capture Ferrellgas' tremendous upside for themselves (which they were well familiar with) at an artificial discount. VanWinkle advised GreatBanc that he and McGathey had entered into contractual management agreements with the buyers to serve as CEO and COO[5] of Ferrellgas, respectively. VanWinkle presented his plan to GreatBanc, and convinced it to support and promote the sale of Ferrellgas to his group.

19.     Meanwhile, in August 2018, Houlihan Lokey made a play to become financial advisor to Ferrellgas in connection with Ferrellgas' attempts to recover from the failed Bridger acquisition. As such, on August 30, 2018, Houlihan Lokey entered into a Confidentiality Agreement with Ferrellgas (Exhibit D). The Confidentiality Agreement acknowledges that during the pursuit of a Ferrellgas engagement, Houlihan Lokey would likely encounter "Confidential Information," which was defined to include "all data… concerning the Company," which Houlihan Lokey was obliged not to disclose.

20.     However, after Houlihan Lokey was not chosen to be Ferrellgas' financial advisor, it turned around and began surreptitiously working with GreatBanc. Starting in November 2018 and in 2019, Houlihan Lokey worked to recruit and provide GreatBanc with potential replacement Ferrellgas directors who would be friendly to both a takeover of Ferrellgas by VanWinkle's group and a Houlihan Lokey restructuring engagement. Thus, Houlihan Lokey worked extensively with GreatBanc to procure GreatBanc's violation of its Trust Agreement and fiduciary duties.

---

and making derogatory, disparaging, or false statements intended to harm the business of Ferrellgas, its directors, officers and employees. McGathey agreed the he would not, at any time, seek re-employment with Ferrellgas.

[5] This was a direct violation of McGathey's Agreement and Release.

21.    Further, upon information and belief, Houlihan Lokey's efforts improperly relied on – and caused the disclosure of – Confidential Information it received during its attempts to be engaged by Ferrellgas.  Without limitation, this Confidential Information included information Houlihan Lokey received from departed management employees of Ferrellgas in November 2018 at a secret meeting with these employees and GreatBanc concerning Ferrellgas' financial position, and how Ferrellgas' executive management was likely to approach negotiations with its creditors and bondholders – arguably the most sensitive, important, and proprietary information a third party could have about Ferrellgas during this critical time.

22.    On July 1, 2019, GreatBanc's Senior Vice President, Kevin Kolb, sent a letter to the Ferrell Companies Board and the FGI Board (Exhibit E).  Kolb enclosed copies of "a Recapitalization Plan Overview" received from VanWinkle's group, Brookfield Asset Management ("Brookfield") and Caligan Partners, LP ("Caligan") (the "Brookfield/Caligan Proposal").  In a clear and unjustified unilateral expansion of GreatBanc's role as Directed Trustee, Kolb's letter implored each of the Board members to form a special committee of outside directors (the "Special Committee") and engage legal and financial advisors to assist the Special Committee in assessing this proposal.  Kolb further insisted that GreatBanc receive a detailed analysis (formulated precisely to GreatBanc's specifications) upon completion of this review.

23.    Jim Ferrell responded to Mr. Kolb's letter on behalf of Ferrellgas in a letter dated July 22, 2019 (Exhibit F).  In the letter, Mr. Ferrell informed GreatBanc that the Ferrell Companies Board decided it was not required nor advisable to establish a Special Committee, but to instead have the full board consider the proposals in conjunction with its outside counsel and its professional advisor, Moelis & Company ("Moelis").  In the summer of 2019, Moelis made

recommendations regarding long-term strategic objectives for addressing the Ferrellgas capital structure, which the Ferrell Companies Board and the FGI Board each approved on July 27, 2019.

24.     At this point, GreatBanc knew that the Ferrell Companies and FGI Boards had retained experienced financial advisors and had appropriately and reasonably exercised their business judgment by adopting long-term strategic objectives to address the balance sheet issues caused by the failed Bridger acquisition, as recommended by Moelis.  Yet, GreatBanc continued to push, acting not as a Directed Trustee, but as an activist in contravention of the Trust Agreement. This activism only increased as summer turned to fall – again, with the assistance and active encouragement of Houlihan Lokey.

25.     In an August 27, 2019 letter to Ferrell Companies' legal counsel, GreatBanc's legal counsel demanded reports of discussions and analyses undertaken by the Ferrell Companies Board regarding third-party proposals received by the company, as well as information regarding "addition of independent Board member(s) comprised of individual(s) proposed by GreatBanc." Ferrellgas later learned the recommendations GreatBanc were from Houlihan Lokey.

26.     In a September 3, 2019 response, Ferrell Companies' legal counsel reiterated that the Ferrell Companies Board had exercised its independent business judgment in developing a long-term strategic plan and rejected GreatBanc's efforts to dictate that plan.  It specifically did not believe that engaging with Brookfield and Caligan regarding their proposal would serve the company's long-term objectives, nor was it required by law, and informed GreatBanc that it need not pursue the matter further.  Ferrell Companies also noted to GreatBanc that the Ferrell Companies Board was comprised of a substantial majority of independent members and, thus, it did not believe that adding any additional independent Ferrell Companies Board members was necessary at the time.

27.     On September 10, 2019, GreatBanc's counsel responded to Ferrellgas' September 3, 2019 letter by continuing to push the Brookfield/Caligan Proposal and seeking a meeting with Ferrellgas "as soon as possible."

28.     Given GreatBanc's continued activism and unjustified intrusion, the Ferrell Companies Board, after consideration and discussion, voted to remove it as Directed Trustee and to retain James Urbach and his company, ESOP Fiduciaries, Inc., as an interim successor trustee. GreatBanc's removal was the culmination of a process that began months prior—as the Ferrell Companies Board considered GreatBanc's future as Directed Trustee—but GreatBanc's aggressive, unwarranted activism was the final straw.

29.     On October 9, 2019, Ferrell Companies sent a Notice of Removal to GreatBanc providing GreatBanc 30 days' notice of its removal and appointing James Urbach as successor Trustee, all in accordance with Section 6.2 of the Trust Agreement (Exhibit G).  This Notice was self-executing. GreatBanc had no right to oppose its own removal, and no further action was required to effectuate its removal.

**V.     As GreatBanc Tries to Cling to its Job, More Vultures Gather.**

30.     GreatBanc did not take the news well.  Rather than exit the Directed Trustee position and allow the Ferrell Companies Board to appoint a successor as it was entitled to, GreatBanc fought to thwart the Board's action.

31.     Watching intently, powerful financial institutions (including but also in addition to Houlihan Lokey) found in GreatBanc a useful collaborator to try to appropriate the value in Ferrellgas for themselves.  GreatBanc was afraid not only of its loss of position, but also the potential that a new Trustee would examine, and seek legal redress for, its prior actions.  As a

result, GreatBanc was a willing partner in helping these financial interests attempt to take control of Ferrellgas wrongfully.

32.     On October 23, 2019, GreatBanc delivered a written ultimatum that Ferrell Companies (as Plan Administrator) direct GreatBanc (as Directed Trustee) to replace its entire Board "by close of business on October 25, 2019" with new directors—secretly hand-picked by Houlihan Lokey for GreatBanc, as Ferrellgas would learn later.  Otherwise, GreatBanc threatened, it would replace the Ferrell Companies Board unilaterally.

33.     GreatBanc's conduct– the attempted unilateral replacement of the entire Ferrell Companies Board *without* direction from that board, which it had no authority to do – was unprecedented, self-interested, and wrongful.  It was also aided by those, including Houlihan Lokey and GreatBanc's own law firm, who hoped to secure lucrative engagements advising Ferrellgas when Ferrellgas was controlled by a new handpicked board.  GreatBanc was also encouraged by a group of bondholders, who undoubtedly understood that replacing the board constituted a change of control that would directly or indirectly cause a default in Ferrellgas' debt instruments and could precipitate a bankruptcy, which they could seek to exploit to gain control of Ferrellgas and capture its future value.

34.     If the Ferrell Companies Board was actually replaced as GreatBanc and Houlihan Lokey intended, the consequences would have been disastrous.  A change of Board control would have destabilized the business, interfered with customer relationships, and, worse, triggered Events of Default by virtue of a "Change of Control" under a credit facility provided by TPG.  This would, upon action by TPG, in turn, cause Events of Default under the company's bond documents.  Thus, GreatBanc and Houlihan Lokey's actions, if successful, would have created a domino effect that would have ultimately forced FGP and its operating company into bankruptcy.  Remarkably, it

appears that GreatBanc was so careless, it did not realize the dire consequences of its actions until *after* Ferrell Companies commenced suit to stop those actions.

35.     To protect its unitholders and employee-owners, Ferrellgas took decisive action. On October 24, 2019, Ferrell Companies filed a lawsuit against GreatBanc, to which GreatBanc responded with a TRO motion to prevent its removal as Directed Trustee. The Court denied the TRO, and that night at midnight, GreatBanc's removal became effective, and its effort to replace the Ferrell Companies Board had failed.

36.     And, even though change of control default would have been disastrous, Houlihan Lokey was so insistent on doing it that, after the Court's decision to deny GreatBanc its requested TRO, Houlihan Lokey still encouraged GreatBanc to proceed to unilaterally replace the Board in the few hours between the hearing and the expiration of GreatBanc's tenure at midnight that very night.  Apparently finally realizing the harm that a change of control would cause, GreatBanc resisted Houlihan Lokey's entreaties and stepped aside to allow GreatBanc's substitute to become the trustee of the Plan.

37.     But the damage was done.  The defendants' actions caused Ferrellgas to incur significant legal and other costs.  During a critical time when Ferrellgas should have been able to focus on improving the company's balance sheet, maximizing value for the ESOP, and improving Ferrellgas' operations, Ferrellgas instead was forced, at every turn, to respond to improper and unjustified attempts to interfere with its governance by hostile third parties.

## FIRST CAUSE OF ACTION
### (Breach Of Contract - GreatBanc)

38.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

39.     GreatBanc breached the Trust Agreement by, among other things, placing its own interests, and those of the third parties, above the interests of the Plan and Plan Participants, improperly interfering in the management of Ferrell Companies, independently demanding that Ferrell Companies engage in a transaction process, demanding the replacement of all of Ferrell Companies' Directors (after receiving notice of being terminated as Directed Trustee), and otherwise usurping and attempting to usurp the business prerogatives of the Ferrell Companies Board.

40.     As a direct and proximate result of GreatBanc's improper conduct, plaintiff has been required to expend significant legal and other fees and costs, in excess of $75,000.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duties in Violation of ERISA § 409(a), 29 U.S.C. § 1109(a) – GreatBanc )**

41.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

42.     At all relevant times, GreatBanc acted as a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

43.     ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), states, in part, that "a fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV."

44.     ERISA § 409(a), 29 U.S.C. § 1109(a), states, in relevant part: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any

losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . ."

45.     GreatBanc violated its obligations under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) by failing to act in accordance with the documents and instruments governing the Plan by its attempted hijacking of the Ferrell Companies Board in violation of the Trust Agreement.

46.     As a direct and proximate result of these acts and omissions, Ferrell Companies, the Plan, and the Plan Participants have suffered losses in excess of $75,000 are and are entitled to relief under ERISA.

## THIRD CAUSE OF ACTION
### (Tortious Interference with Contract – Houlihan Lokey)

47.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

48.     GreatBanc had contractual and fiduciary duties to Ferrellgas pursuant to the Trust Agreement, as set forth above.

49.     Upon information and belief, Houlihan Lokey was aware of these contractual and fiduciary duties.  Indeed, Houlihan Lokey touts itself as a "market leader" and "recognized leader" in sophisticated financial transactions and relationships.

50.     Houlihan Lokey, however, intentionally procured GreatBanc's breach of its contractual and fiduciary obligations under the Trust Agreement without justification for doing so. Indeed, Houlihan Lokey was motivated by its desire to become engaged in the Ferrellgas work – any way that it could.

51.     As a direct and proximate result of Houlihan Lokey's acts, Plaintiff has been required to expend significant legal and other fees and costs, in excess of $75,000.

## FOURTH CAUSE OF ACTION
### (Breach of Contract – Houlihan Lokey )

52.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

53.     Houlihan Lokey entered into a Confidentiality Agreement with Ferrellgas dated August 30, 2018 (Exhibit D).

54.     Under the Confidentiality Agreement, Houlihan Lokey was obliged not to disclose any "Confidential Information" pertaining to Ferrellgas.  "Confidential Information" was defined in the Confidential Agreement as "all data, reports, financial statements, projections, documents and records containing or otherwise reflecting information concerning the Company, its business(es), prospects and/or customers, in any form or medium and whether communicated in writing, orally, or otherwise, which are provided to Houlihan Lokey by or on behalf of the Company on or after the date of this Agreement, together with any analyses, compilations, studies or other documents prepared by the Company."

55.     Upon information and belief, Houlihan Lokey did disclose Confidential Information to GreatBanc and others.  Specifically, upon information and belief (and without limitation), Houlihan Lokey disclosed Confidential Information pertaining to Ferrellgas' financial position and negotiating strategies that it received in the fall of 2018, including from a handful of disgruntled Ferrellgas employees that left the company shortly afterward.

56.     As a direct and proximate result of Houlihan Lokey's acts, plaintiff has been required to expend significant legal fees and other costs in excess of $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Ferrell Companies seeks:

(a)     Compensatory damages in excess of $75,000, as determined at trial;

{00207157.DOCX}

010-9051-7884/6/AMERICAS

(b)     Punitive damages;

(c)     Attorneys' fees; and

(d)     Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Ferrell Companies hereby demands a jury for all claims set forth herein that are triable by jury in Kansas City, Kansas.

Dated:  May 4, 2020


Respectfully submitted,

Of Counsel:                                *s/James D. Griffin*

Sarah K. Rathke (Ohio Bar #0074280)          James D. Griffin          KS # 12545
(*pro hac vice* to be filed)                 Brent N. Coverdale          KS # 18798
SQUIRE PATTON BOGGS (US) LLP                  SCHARNHORST AST KENNARD GRIFFIN PC
4900 Key Tower                               1100 Walnut Street, Suite 1950
127 Public Square                            Kansas City, MO  64106
Cleveland, Ohio 44114                        Tel: (816) 268-9400
Tel:  (216) 479-8500                         Fax: (816) 268-9409
Fax: (216) 479-8780                          E-mail:jgriffin@sakg.com
Email: sara.rathke@squirepb.com                      bcoverdale@sakg.com


*Attorneys for Ferrell Companies, Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May, 2020 a true and correct copy of the above and foregoing was filed with the Court via its CM/ECF system and that a copy will be served on defendants with Summons..

*/s/ James D. Griffin*
*Attorney for Plaintiff*