## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| **FERRELL COMPANIES, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:20-cv-02229-JTM-KGG |
| | ) | |
| v. | ) | |
| | ) | |
| **GREATBANC TRUST COMPANY**, and | ) | |
| **HOULIHAN LOKEY CAPITAL, INC.,** | ) | |
| | ) | |
| Defendants. | | |

### DEFENDANT GREATBANC TRUST COMPANY'S ANSWER
### AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

Defendant GreatBanc Trust Company ("GreatBanc"), by and through its attorneys, hereby submits its Answer and Affirmative Defenses to the Complaint filed by Plaintiff Ferrell Companies, Inc. ("Ferrell Companies" or "FCI"). To the extent the Complaint's un-numbered introductory paragraphs, headings, and footnotes reflect allegations of fact, those allegations are denied.

### PARTIES

1.     Ferrell Companies is a Kansas corporation with its headquarters and principal place of business in Overland Park, Kansas. Among other things, Ferrell Companies and its affiliates, including FGI, FGP and OpCo[3], are engaged in the marketing and sale of propane products throughout the United States.

**ANSWER:**     GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 1, including footnote 3 cited therein, except that GreatBanc admits that Ferrell Companies is a Kansas corporation with its headquarters and principal place of business in Overland Park, Kansas, and that Ferrell Companies and/or one or

---

[3] *See supra* note 1.

more of its affiliates are engaged in the marketing and sale of propane products throughout the United States.

2.      GreatBanc is an Illinois corporation with its principal place of business in Lisle, Illinois.

**ANSWER:**   GreatBanc admits the allegations made in paragraph 2.

3.      Houlihan Lokey is a California corporation with its principal place of business in Los Angeles, California.

**ANSWER:**   The allegations made in paragraph 3 are not directed against GreatBanc, thus GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 3.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332, as this matter arises between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:**   GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 4.

5.      Jurisdiction in this Court also is proper pursuant to 28 U.S.C. § 1331 as this action arises out of GreatBanc's breaches of its agreement to serve as a Directed Trustee of an employee stock ownership trust subject to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), and Houlihan Lokey's tortious participation in effectuating those breaches.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 5, except that GreatBanc admits that this action purports to assert claims arising out of alleged violations of obligations imposed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

6.      The Court has personal jurisdiction over GreatBanc and Houlihan Lokey, as the acts complained of occurred or were directed to Ferrell Companies and the Plan in this District.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to Ferrell Companies' claims occurred in this District.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 6, except that GreatBanc

submits to personal jurisdiction in this action and consents to venue in this District.

## FACTS

7.     Ferrellgas' rise as a great American company began in 1965 when Jim Ferrell, after service in the U.S Army, returned home to help his father with his company, the A.C. Ferrell Butane Company. At the time, the A.C. Ferrell Butane Gas Company, founded in 1939, was a local propane company with a single store in Atchison, Kansas, that was struggling financially. Jim Ferrell, over many years, grew the business from a single, insignificant, small store into a premier propane company with operations in 49 states. Ferrellgas' Blue Rhino propane cylinder exchange business is the leading and most recognized propane brand in the nation with more than 55,000 locations in all 50 states and Puerto Rico.

**ANSWER:**   GreatBanc lacks knowledge or information sufficient to form a belief about the

truth of the allegations made in paragraph 7.

8.     On August 1, 1996, Ferrell Companies established the Plan (Exhibit A), which gave employees the right to share in the ownership in Ferrell Companies through an Employee Stock Ownership Trust. The Plan is administered by the Ferrell Companies as Plan Administrator, acting through the Ferrell Companies Board of Directors, which appoints a Plan Trustee to act at its direction. This Directed Trustee technically elects the members of the Ferrell Companies Board, but per its contract (the Trust Agreement), the Directed Trustee may only vote its shares as the Plan Administrator directs. In other words, the Directed Trustee has no independent right or authority to change the composition of the Ferrell Companies Board.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 8, except that GreatBanc

admits the following: that Ferrell Companies is the named Plan Administrator, acting through its

Board of Directors; and that Exhibit A to the Complaint reflects the Ferrell Companies, Inc.

Employee Stock Ownership Plan (the "ESOP" or "Plan").  GreatBanc respectfully refers the Court

to Exhibit A for the complete contents of the document referenced in paragraph 8.

9.     Ferrell Companies indirectly controls the Ferrellgas operating companies (FGP and OpCo) by virtue of its 100% ownership of their general partner, FGI. *See supra* footnote 1. The Ferrell Companies Board elects the board of directors of FGI, which manages FGP and OpCo (as the General Partner of each) under the applicable limited partnership agreements.

**ANSWER:**    GreatBanc lacks knowledge or information sufficient to form a belief about the

truth of the allegations made in paragraph 9, as well as footnote 1 cited therein.

10.    On August 1, 1997, Ferrell Companies and LaSalle National Bank ("LaSalle") entered into an agreement (the "Trust Agreement") to appoint LaSalle as Directed Trustee of the Plan (Exhibit B). The Plan and Trust Agreement collectively are referred to as the "ESOP." When GreatBanc acquired LaSalle in 2005, GreatBanc became the successor trustee, and as such became bound by the Trust Agreement.

**ANSWER:**    GreatBanc denies all of the allegations made in paragraph 10, except that

GreatBanc admits that Exhibit B to the Complaint reflects the Ferrell Companies, Inc. Employee

Stock Ownership Trust ("Trust Agreement"), that LaSalle National Bank was GreatBanc's

predecessor Trustee, and that GreatBanc became Trustee of the Plan in 2005.

11.    Pursuant to the Trust Agreement and ERISA, GreatBanc was a "directed trustee," which means it could generally take actions only as directed by the Plan Administrator, Ferrell Companies, under the direction of its Board. Section 2.2 of the Trust Agreement provides that "[t]he powers, duties and responsibilities of the Trustee shall be limited to those set forth in this Trust Agreement, and nothing contained in the Plan, either expressly or by implication, shall be deemed to impose any additional powers, duties or responsibilities on the Trustee." Section 2.6 of the Trust Agreement similarly provides that "the Trustee shall have no authority to act unless directed by the Plan Administrator." Thus, the Trust Agreement prohibits GreatBanc from making unilateral decisions with respect to most matters affecting the ESOP. Among these is the decision to name or replace members of the Board.

**ANSWER:**    GreatBanc denies all of the allegations made in paragraph 11, except that

GreatBanc admits it was a "directed trustee" pursuant to the Trust Agreement and respectfully

refers the Court to Exhibit B of the Complaint for the complete contents of the document

selectively and incompletely quoted or paraphrased in paragraph 11.

12.    The Trust Agreement also provides that GreatBanc must act with prudence and solely in the interest of Plan Participants. Section 2.5 of the Trust Agreement provides, among other things, that "[t]he Trustee shall discharge its duties hereunder solely in the interests of the Plan's Participants and other persons entitled to benefits under the Plan," and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 12, except that GreatBanc admits that the quote recited in paragraph 12 is included in the Trust Agreement and respectfully refers the Court to Exhibit B of the Complaint for the complete contents of the document selectively and incompletely quoted or paraphrased in paragraph 12.

13.     The Trust Agreement gave GreatBanc no responsibility or authority with respect to the management or operations of FGP or OpCo. Conversely, Section 6.2 of the Trust Agreement gave the Ferrell Companies Board the absolute right to remove and replace the Trustee upon advance notice and offering evidence that a successor Trustee has accepted the Trusteeship. See Trust Agreement § 6.2.

**ANSWER:**   GreatBanc denies all of the allegations in paragraph 13, and respectfully refers the Court to Exhibit B of the Complaint for the complete contents of the document selectively and incompletely paraphrased in paragraph 13.

14.     In 2015, looking to diversify its revenue streams, Ferrellgas' then-management identified Bridger Logistics LLC ("Bridger") as an acquisition target. Bridger was a midstream transportation company primarily engaged in shipping oil from the Bakken Formation in North Dakota to refineries on the East Coast. Ferrellgas thought Bridger presented a good opportunity to diversify because of the strength of its business in the oil and gas industry and what the then-management believed and promoted as a low-risk contract structure.

**ANSWER:**   GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 14.

15.     The price tag for the Bridger acquisition was $822 million. As permitted by its Trustee Agreement with Ferrell Companies and at Ferrell Companies' request, GreatBanc acted as a discretionary trustee of the ESOP for a special assignment to assess the proposed Bridger transaction on behalf of the Plan Participants (Exhibit C). In this special capacity as a discretionary, rather than directed, trustee, GreatBanc was asked to independently assess the Bridger transaction exercising its own fiduciary judgment. For these efforts, GreatBanc requested and was paid a fee of $500,000—ten times its annual compensation as Directed Trustee. After conducting its own review and analysis, GreatBanc independently concluded that the Bridger acquisition was in the best interest of Plan Participants and approved it.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 15, except that GreatBanc admits that Exhibit C of the Complaint reflects the Seventh Amendment to the Trustee Agreement between Ferrell Companies and GreatBanc and that amendment sets forth the terms of

GreatBanc's engagement related to the Bridger transaction. GreatBanc respectfully refers the Court to Exhibit C of the Complaint for the complete contents of the document selectively and incompletely paraphrased in paragraph 15. Additionally, to the extent paragraph 15 alleges that GreatBanc "approved" the Bridger transaction, GreatBanc denies any such allegations and further states that GreatBanc did not object to the Ferrell Companies' Board moving forward with the transaction.

16.     The Bridger acquisition was financed by the sale of additional limited partnership interests in FGP and the issuance of FGP and OpCo bond debt that totaled over $500 million. Before agreeing to the financing arrangement, numerous financial institutions, including the underwriter of the bond debt, conducted their own diligence and concluded the financing of the acquisition was sound.

**ANSWER:**     GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 16.

17.     After closing the Bridger acquisition and incurring the acquisition-related debt, a confluence of factors resulted in Bridger's failure. Eventually, without the expected revenue from Bridger, Ferrellgas struggled financially, causing a need to restructure the debt associated with the Bridger acquisition. Ferrellgas addressed these challenges in a variety of ways. Among other things, Jim Ferrell, who had retired from leading the company after the creation of the ESOP, was asked to return to the helm as Interim CEO.

**ANSWER:**     GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 17, except that GreatBanc admits that Ferrellgas struggled financially and was at risk of failing after the Bridger transaction.

18.     As new management worked with the Board on solutions to remedy Ferrellgas' debt burden, GreatBanc, fearing as to its liability in connection with the Bridger acquisition, began to interfere. To that end, GreatBanc collaborated with ousted Ferrellgas CFO, Ryan VanWinkle, and ousted Ferrellgas COO, Boyd McGathey, both terminated in 2015.[4] VanWinkle and McGathey represented a group of buyers who saw an opportunity to capture Ferrellgas' tremendous upside for themselves (which they were well familiar with) at an artificial discount. VanWinkle advised GreatBanc that he and McGathey had entered into contractual management

---

[4] Their actions violated the Agreements they signed when they left Ferrellgas which prohibited them from, among other things, disclosing confidential information about Ferrellgas, and making derogatory, disparaging, or false statements intended to harm the business of Ferrellgas, its directors, officers and employees. McGathey agreed that he would not, at any time, seek re-employment with Ferrellgas.

agreements with the buyers to serve as CEO and COO[5] of Ferrellgas, respectively. VanWinkle presented his plan to GreatBanc, and convinced it to support and promote the sale of Ferrellgas to his group.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 18, except that

GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the

allegations made in footnotes 4 and 5.

19.   Meanwhile, in August 2018, Houlihan Lokey made a play to become financial advisor to Ferrellgas in connection with Ferrellgas' attempts to recover from the failed Bridger acquisition. As such, on August 30, 2018, Houlihan Lokey entered into a Confidentiality Agreement with Ferrellgas (Exhibit D). The Confidentiality Agreement acknowledges that during the pursuit of a Ferrellgas engagement, Houlihan Lokey would likely encounter "Confidential Information," which was defined to include "all data... concerning the Company," which Houlihan Lokey was obliged not to disclose.

**ANSWER:**   The allegations made in paragraph 19 are not directed against GreatBanc, thus

GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc

lacks knowledge or information sufficient to form a belief about the truth of the allegations made

in paragraph 19.

20.   However, after Houlihan Lokey was not chosen to be Ferrellgas' financial advisor, it turned around and began surreptitiously working with GreatBanc. Starting in November 2018 and in 2019, Houlihan Lokey worked to recruit and provide GreatBanc with potential replacement Ferrellgas directors who would be friendly to both a takeover of Ferrellgas by VanWinkle's group and a Houlihan Lokey restructuring engagement. Thus, Houlihan Lokey worked extensively with GreatBanc to procure GreatBanc's violation of its Trust Agreement and fiduciary duties.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 20.

21.   Further, upon information and belief, Houlihan Lokey's efforts improperly relied on — and caused the disclosure of — Confidential Information it received during its attempts to be engaged by Ferrellgas. Without limitation, this Confidential Information included information Houlihan Lokey received from departed management employees of Ferrellgas in November 2018 at a secret meeting with these employees and GreatBanc concerning Ferrellgas' financial position, and how Ferrellgas' executive management was likely to approach negotiations with its creditors and bondholders — arguably the most sensitive, important, and proprietary information a third party could have about Ferrellgas during this critical time.

---

[5]  This was a direct violation of McGathey's Agreement and Release.

**ANSWER:**     GreatBanc denies all allegations made in paragraph 21.

22.     On July 1, 2019, GreatBanc's Senior Vice President, Kevin Kolb, sent a letter to the Ferrell Companies Board and the FGI Board (Exhibit E). Kolb enclosed copies of "a Recapitalization Plan Overview" received from VanWinkle's group, Brookfield Asset Management ("Brookfield") and Caligan Partners, LP ("Caligan") (the "Brookfield/Caligan Proposal"). In a clear and unjustified unilateral expansion of GreatBanc's role as Directed Trustee, Kolb's letter implored each of the Board members to form a special committee of outside directors (the "Special Committee") and engage legal and financial advisors to assist the Special Committee in assessing this proposal. Kolb further insisted that GreatBanc receive a detailed analysis (formulated precisely to GreatBanc's specifications) upon completion of this review.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 22, except that GreatBanc admits that Kevin Kolb is a Senior Vice President at GreatBanc, that Mr. Kolb sent a letter dated July 1, 2019 to the Board of Directors of Ferrell Companies and Ferrellgas, LP, and that a copy of Mr. Kolb's letter is reflected in Exhibit E of the Complaint. GreatBanc respectfully refers the Court to Exhibit E of the Complaint for the complete contents of the document selectively and incompletely quoted or paraphrased in paragraph 22.

23.     Jim Ferrell responded to Mr. Kolb's letter on behalf of Ferrellgas in a letter dated July 22, 2019 (Exhibit F). In the letter, Mr. Ferrell informed GreatBanc that the Ferrell Companies Board decided it was not required nor advisable to establish a Special Committee, but to instead have the full board consider the proposals in conjunction with its outside counsel and its professional advisor, Moelis & Company ("Moelis"). In the summer of 2019, Moelis made recommendations regarding long-term strategic objectives for addressing the Ferrellgas capital structure, which the Ferrell Companies Board and the FGI Board each approved on July 27, 2019.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 23, except that GreatBanc admits that Jim Ferrell sent GreatBanc a letter dated July 22, 2019, and that a copy of Mr. Ferrell's letter is reflected in Exhibit F of the Complaint and except that GreatBanc is without knowledge or information sufficient to form a belief about the truth of the allegations made concerning Moelis & Company. GreatBanc respectfully refers the Court to Exhibit F of the Complaint for the complete contents of the document selectively and incompletely paraphrased in paragraph 23.

24.     At this point, GreatBanc knew that the Ferrell Companies and FGI Boards had retained experienced financial advisors and had appropriately and reasonably exercised their business judgment by adopting long-term strategic objectives to address the balance sheet issues caused by the failed Bridger acquisition, as recommended by Moelis. Yet, GreatBanc continued to push, acting not as a Directed Trustee, but as an activist in contravention of the Trust Agreement. This activism only increased as summer turned to fall — again, with the assistance and active encouragement of Houlihan Lokey.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 24.

25.     In an August 27, 2019 letter to Ferrell Companies' legal counsel, GreatBanc's legal counsel demanded reports of discussions and analyses undertaken by the Ferrell Companies Board regarding third-party proposals received by the company, as well as information regarding "addition of independent Board member(s) comprised of individual(s) proposed by GreatBanc." Ferrellgas later learned the recommendations GreatBanc were from Houlihan Lokey.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 25, except that GreatBanc admits that its legal counsel sent a letter to legal counsel for the Ferrell Companies, dated August 27, 2019, a true and accurate copy of which is attached hereto as Exhibit 1. GreatBanc respectfully refers the Court to Exhibit 1 of this Answer for the complete contents of the document selectively and incompletely quoted or paraphrased in paragraph 25.

26.     In a September 3, 2019 response, Ferrell Companies' legal counsel reiterated that the Ferrell Companies Board had exercised its independent business judgment in developing a long-term strategic plan and rejected GreatBanc's efforts to dictate that plan. It specifically did not believe that engaging with Brookfield and Caligan regarding their proposal would serve the company's long-term objectives, nor was it required by law, and informed GreatBanc that it need not pursue the matter further. Ferrell Companies also noted to GreatBanc that the Ferrell Companies Board was comprised of a substantial majority of independent members and, thus, it did not believe that adding any additional independent Ferrell Companies Board members was necessary at the time.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 26, except that GreatBanc admits that its legal counsel received a letter from legal counsel for Ferrell Companies, dated September 3, 2019, a true and accurate copy of which is attached hereto as Exhibit 2. GreatBanc respectfully refers the Court to Exhibit 2 of this Answer for the complete contents of the document selectively and incompletely paraphrased in paragraph 26.

27.     On September 10, 2019, GreatBanc's counsel responded to Ferrellgas' September 3, 2019 letter by continuing to push the Brookfield/Caligan Proposal and seeking a meeting with Ferrellgas "as soon as possible."

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 27, except that GreatBanc admits that its legal counsel sent a letter to legal counsel for the Ferrell Companies, dated September 10, 2019, a true and accurate copy of which is attached hereto as Exhibit 3. GreatBanc respectfully refers the Court to Exhibit 3 of this Answer for the complete contents of the document selectively, incompletely, and inaccurately quoted or paraphrased in paragraph 27.

28.     Given GreatBanc's continued activism and unjustified intrusion, the Ferrell Companies Board, after consideration and discussion, voted to remove it as Directed Trustee and to retain James Urbach and his company, ESOP Fiduciaries, Inc., as an interim successor trustee. GreatBanc's removal was the culmination of a process that began months prior—as the Ferrell Companies Board considered GreatBanc's future as Directed Trustee—but GreatBanc's aggressive, unwarranted activism was the final straw.

**ANSWER:**     GreatBanc denies all of the allegations made against it in paragraph 28, except that GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding what the Ferrell Companies Board considered, discussed, or voted on, as alleged in paragraph 28.

29.     On October 9, 2019, Ferrell Companies sent a Notice of Removal to GreatBanc providing GreatBanc 30 days' notice of its removal and appointing James Urbach as successor Trustee, all in accordance with Section 6.2 of the Trust Agreement (Exhibit G). This Notice was self-executing. GreatBanc had no right to oppose its own removal, and no further action was required to effectuate its removal.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 29, except that GreatBanc admits that it received a 30-day Notice of Removal from Ferrell Companies, dated October 9, 2019, and that a copy of such notice is reflected in Exhibit G of the Complaint. GreatBanc respectfully refers the Court to Exhibit G of the Complaint for the complete contents of the document selectively and incompletely paraphrased in paragraph 29.

30.     GreatBanc did not take the news well. Rather than exit the Directed Trustee position and allow the Ferrell Companies Board to appoint a successor as it was entitled to, GreatBanc fought to thwart the Board's action.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 30.

31.     Watching intently, powerful financial institutions (including but also in addition to Houlihan Lokey) found in GreatBanc a useful collaborator to try to appropriate the value in Ferrellgas for themselves. GreatBanc was afraid not only of its loss of position, but also the potential that a new Trustee would examine, and seek legal redress for, its prior actions. As a result, GreatBanc was a willing partner in helping these financial interests attempt to take control of Ferrellgas wrongfully.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 31.

32.     On October 23, 2019, GreatBanc delivered a written ultimatum that Ferrell Companies (as Plan Administrator) direct GreatBanc (as Directed Trustee) to replace its entire Board "by close of business on October 25, 2019" with new directors—secretly hand-picked by Houlihan Lokey for GreatBanc, as Ferrellgas would learn later. Otherwise, GreatBanc threatened, it would replace the Ferrell Companies Board unilaterally.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 32, except that

GreatBanc admits that it sent a letter to the Board of Directors for Ferrell Companies and

Ferrellgas, LP, dated October 23, 2019, a true and accurate copy of which is attached hereto as

Exhibit 4, requesting that Ferrell Companies, as the Plan Administrator, remove and replace the

Board with independent directors. GreatBanc respectfully refers the Court to Exhibit 4 of this

Answer for the complete contents of the document selectively and incompletely quoted or

paraphrased in paragraph 32.

33.     GreatBanc's conduct— the attempted unilateral replacement of the entire Ferrell Companies Board without direction from that board, which it had no authority to do — was unprecedented, self-interested, and wrongful. It was also aided by those, including Houlihan Lokey and GreatBanc's own law firm, who hoped to secure lucrative engagements advising Ferrellgas when Ferrellgas was controlled by a new handpicked board. GreatBanc was also encouraged by a group of bondholders, who undoubtedly understood that replacing the board constituted a change of control that would directly or indirectly cause a default in Ferrellgas' debt instruments and could precipitate a bankruptcy, which they could seek to exploit to gain control of Ferrellgas and capture its future value.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 33.

34.     If the Ferrell Companies Board was actually replaced as GreatBanc and Houlihan Lokey intended, the consequences would have been disastrous. A change of Board control would have destabilized the business, interfered with customer relationships, and, worse, triggered Events of Default by virtue of a "Change of Control" under a credit facility provided by TPG. This would, upon action by TPG, in turn, cause Events of Default under the company's bond documents. Thus, GreatBanc and Houlihan Lokey's actions, if successful, would have created a domino effect that would have ultimately forced FGP and its operating company into bankruptcy.  Remarkably, it appears that GreatBanc was so careless, it did not realize the dire consequences of its actions until *after* Ferrell Companies commenced suit to stop those actions.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 34.

35.     To protect its unitholders and employee-owners, Ferrellgas took decisive action. On October 24, 2019, Ferrell Companies filed a lawsuit against GreatBanc, to which GreatBanc responded with a TRO motion to prevent its removal as Directed Trustee. The Court denied the TRO, and that night at midnight, GreatBanc's removal became effective, and its effort to replace the Ferrell Companies Board had failed.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 35, except that GreatBanc admits the following:  that Ferrell Companies filed an action against GreatBanc on October 24, 2019; that GreatBanc, in its role as the ESOP's Trustee,  sought to obtain a temporary restraining order in such action that would allow GreatBanc to maintain its status as Trustee until the Court decided GreatBanc's motion for preliminary injunction; that the Court denied GreatBanc's motion for a temporary restraining order; and that  GreatBanc's removal as Trustee became effective on November 8, 2019.

36.     And, even though change of control default would have been disastrous, Houlihan Lokey was so insistent on doing it that, after the Court's decision to deny GreatBanc its requested TRO, Houlihan Lokey still encouraged GreatBanc to proceed to unilaterally replace the Board in the few hours between the hearing and the expiration of GreatBanc's tenure at midnight that very night. Apparently finally realizing the harm that a change of control would cause, GreatBanc resisted Houlihan Lokey's entreaties and stepped aside to allow GreatBanc's substitute to become the trustee of the Plan.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 36, except that GreatBanc admits that it allowed its successor to replace GreatBanc as Trustee of the Plan.

37.     But the damage was done. The defendants' actions caused Ferrellgas to incur significant legal and other costs. During a critical time when Ferrellgas should have been able to

focus on improving the company's balance sheet, maximizing value for the ESOP, and improving Ferrellgas' operations, Ferrellgas instead was forced, at every turn, to respond to improper and unjustified attempts to interfere with its governance by hostile third parties.

**ANSWER:**   GreatBanc denies all allegations that its actions caused damages to Ferrell Companies or "Ferrellgas," and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations made in paragraph 37.

## COUNT ONE

### BREACH OF CONTRACT - GREATBANC

38.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

**ANSWER:**   GreatBanc realleges and incorporates by reference its answers to paragraphs 1 through 37 above as its answer to paragraph 38 as if those answers are set forth fully herein.

39.    GreatBanc breached the Trust Agreement by, among other things, placing its own interests, and those of the third parties, above the interests of the Plan and Plan Participants, improperly interfering in the management of Ferrell Companies, independently demanding that Ferrell Companies engage in a transaction process, demanding the replacement of all of Ferrell Companies' Directors (after receiving notice of being terminated as Directed Trustee), and otherwise usurping and attempting to usurp the business prerogatives of the Ferrell Companies Board.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 39.

40.    As a direct and proximate result of GreatBanc's improper conduct, plaintiff has been required to expend significant legal and other fees and costs, in excess of $75,000.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 40.

## COUNT TWO

### BREACH OF FIDUCIARY DUTIES IN VIOLATION OF ERISA ERISA § 409(a), 29 U.S.C. § 1109(a) — GREATBANC

41.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

**ANSWER:**   GreatBanc realleges and incorporates by reference its answers to paragraphs 1 through 40 above as its answer to paragraph 41 as if those answers are set forth fully herein.

42.     At all relevant times, GreatBanc acted as a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 42, except that GreatBanc admits that it had fiduciary duties as set forth in the Trust Agreement and as set forth in ERISA.

43.     ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), states, in part, that "a fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV."

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 43, except that GreatBanc admits that it had fiduciary duties as set forth in the Trust Agreement and as set forth in ERISA .

44.     ERISA § 409(a), 29 U.S.C. § 1109(a), states, in relevant part: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . ."

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 44, and respectfully refers the Court to the statute that is incompletely and inaccurately quoted or paraphrased in paragraph 44.

45.     GreatBanc violated its obligations under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) by failing to act in accordance with the documents and instruments governing the Plan by its attempted hijacking of the Ferrell Companies Board in violation of the Trust Agreement.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 45.

46.     As a direct and proximate result of these acts and omissions, Ferrell Companies, the Plan, and the Plan Participants have suffered losses in excess of $75,000 are and are entitled to relief under ERISA.

**ANSWER:**     GreatBanc denies all of the allegations made in paragraph 46.

## COUNT THREE

## TORTIOUS INTERFERENCE WITH CONTRACT – HOULIHAN LOKEY

47.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

**ANSWER:**    GreatBanc realleges and incorporates by reference its answers to paragraphs 1 through 46 above as its answer to paragraph 47 as if those answers are set forth fully herein.

48.     GreatBanc had contractual and fiduciary duties to Ferrellgas pursuant to the Trust Agreement, as set forth above.

**ANSWER:**    GreatBanc denies all of the allegations made in paragraph 48, and further states that such denial is based on Plaintiff's definition of the term "Ferrellgas," as set forth in footnote 1 of the Complaint, which encompasses "multiple corporate entities," each of which are allegedly "separate and distinct."

49.     Upon information and belief, Houlihan Lokey was aware of these contractual and fiduciary duties. Indeed, Houlihan Lokey touts itself as a "market leader" and "recognized leader" in sophisticated financial transactions and relationships.

**ANSWER:**    The allegations made in paragraph 49 are not directed against GreatBanc, thus GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 49.

50.     Houlihan Lokey, however, intentionally procured GreatBanc's breach of its contractual and fiduciary obligations under the Trust Agreement without justification for doing so. Indeed, Houlihan Lokey was motivated by its desire to become engaged in the Ferrellgas work — any way that it could.

**ANSWER:**    GreatBanc denies all of the allegations made in paragraph 50.

51.     As a direct and proximate result of Houlihan Lokey's acts, Plaintiff has been required to expend significant legal and other fees and costs, in excess of $75,000.

**ANSWER:**   The allegations made in paragraph 51 are not directed against GreatBanc, thus GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc denies all allegations made in paragraph 51.

**COUNT FOUR**

**BREACH OF CONTRACT – HOULIHAN LOKEY**

52.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully restated herein.

**ANSWER:**   GreatBanc realleges and incorporates by reference its answers to paragraphs 1 through 51 above as its answer to paragraph 52 as if those answers are set forth fully herein.

53.   Houlihan Lokey entered into a Confidentiality Agreement with Ferrellgas dated August 30, 2018 (Exhibit D).

**ANSWER:**   The allegations made in paragraph 53 are not directed against GreatBanc, thus GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 53.

54.   Under the Confidentiality Agreement, Houlihan Lokey was obliged not to disclose any "Confidential Information" pertaining to Ferrellgas. "Confidential Information" was defined in the Confidential Agreement as "all data, reports, financial statements, projections, documents and records containing or otherwise reflecting information concerning the Company, its business(es), prospects and/or customers, in any form or medium and whether communicated in writing, orally, or otherwise, which are provided to Houlihan Lokey by or on behalf of the Company on or after the date of this Agreement, together with any analyses, compilations, studies or other documents prepared by the Company."

**ANSWER:**   The allegations made in paragraph 54 are not directed against GreatBanc, thus GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc lacks knowledge or information sufficient to form a belief about the truth of the allegations made in paragraph 54.

55.   Upon information and belief, Houlihan Lokey did disclose Confidential Information to GreatBanc and others. Specifically, upon information and belief (and without

limitation), Houlihan Lokey disclosed Confidential Information pertaining to Ferrellgas' financial position and negotiating strategies that it received in the fall of 2018, including from a handful of disgruntled Ferrellgas employees that left the company shortly afterward.

**ANSWER:**   GreatBanc denies all of the allegations made in paragraph 55.

56.   As a direct and proximate result of Houlihan Lokey's acts, plaintiff has been required to expend significant legal fees and other costs in excess of $75,000

**ANSWER:**   The allegations made in paragraph 56 are not directed against GreatBanc, thus GreatBanc need not respond to those allegations. To the extent any response is required, GreatBanc denies all allegations made in paragraph 56.

### PRAYER FOR RELIEF

GreatBanc denies that Plaintiff Ferrell Companies, Inc. is entitled to any of the relief requested in the Complaint's prayer for relief.

### DEMAND FOR JURY TRIAL

No response is required from GreatBanc.

## GREATBANC'S AFFIRMATIVE DEFENSES

For its separate and independent defenses in this action, and without conceding that it bears the burden of proof or persuasion as to any defense, GreatBanc hereby submits its affirmative defenses against Ferrell Companies, Inc. ("FCI") and alleges as follows:

### First Affirmative Defense:  Breach of Fiduciary Duties

1.      FCI's claims are barred, in whole or in part, because FCI and its Board of Directors ("Board"), acting as the Plan Sponsor and Plan Administrator, breached fiduciary duties owed to the ESOP under ERISA.

2.      For over 13 years, GreatBanc faithfully discharged its ERISA fiduciary obligations to preserve the assets of the ESOP. Any alleged harm to FCI does not arise from actions taken by GreatBanc, but from the actions and inactions of an entrenched and conflicted Board that sought to maintain complete power and control over FCI and its affiliates and subsidiaries (collectively, the "Company") at the expense of everything else, including the ESOP to which GreatBanc was Trustee.

3.      As Plan Administrator, FCI and the Board oversaw a cataclysmic plunge in the value of the Plan's assets, to the detriment of the Plan's beneficiaries and participants. For example, the Company's capital structure included $2.2 billion of debt and its net leverage was more than double the industry average. S&P Global Ratings downgraded the Company's credit rating to CCC-. In addition, the interests of FCI's publicly traded partnership, Ferrellgas Partners, L.P. ("FGP"), steadily declined in value in the two years preceding GreatBanc's removal as Trustee, frequently trading under $1.00 per share, and ultimately resulting in FGP voluntarily delisting its common units from the NYSE in January 2020.

4.      The value of the ESOP was tied to FCI's financial performance. Thus, to protect the Plan and mitigate further damage, GreatBanc requested that the Board form a special

committee to consider various recapitalization plans aimed at addressing the Company's fast deteriorating financial condition. GreatBanc also proposed names of various individuals who could serve as independent directors.

5.     Inexplicably, the Board not only refused to consider these proposals and requests, it shut down communication with GreatBanc and refused to share details regarding the plans, proposals, or strategies that the Board was actually considering. As a result, GreatBanc faced the prospect of carrying out its duties as Trustee in an informational vacuum created by FCI and the Board (*i.e.*, the Plan Sponsor and Plan Administrator).

6.     In public SEC filings, the Company has continuously represented that, "*[i]n all cases, the [ESOP] Trustee may vote the shares as it determines is necessary to fulfill its fiduciary duties under ERISA*," (emphasis added), which is consistent with the statute itself. Nevertheless, as the Company's financial condition worsened, FCI and the Board grew more insular and defensive. What started with dismissing GreatBanc's legitimate requests and reminding GreatBanc of its limited role as "directed trustee," soon resulted in more formal action to undercut GreatBanc's ability to protect the ESOP.

7.     More specifically, in July 2019 – shortly after the Board rebuffed GreatBanc's request to consider various recapitalization proposals and independent directors – FCI and the Board amended the Trust Agreement to provide that the Trustee must vote the Company stock as directed by the Company (as the Plan Administrator). That amendment was not only inconsistent with representations made in the Company's SEC filings, it was also inconsistent with ERISA.

8.     In other words, the Board was not only unresponsive and dismissive, it was determined to act without any regard for the soundness of its decisions or the fiduciary duty owed to the ESOP. In October 2019, GreatBanc made a request to the Board for direction to replace the

Board with a slate of new, well-qualified, and independent directors. FCI responded to that request by filing suit against GreatBanc, alleging that the Company would be irreparably harmed by GreatBanc's request. That lawsuit was dismissed after GreatBanc stepped down as Trustee on November 8, 2019.

9.       By filing the instant suit against GreatBanc, FCI again looks to displace blame and protect the Board from its own mismanagement and breaches of fiduciary duties. This lawsuit will not only vindicate GreatBanc, it will shed additional light on the extent of self-dealing and misconduct on the part of FCI and the Board.

## Second Affirmative Defense:  No Injury to the ESOP

10.       FCI's claims are barred, in whole or in part, to the extent that the ESOP itself was not injured on account of the claims alleged against GreatBanc.

## Third Affirmative Defense:  ERISA Preemption

11.       To the extent FCI asserts state law claims against GreatBanc, including for breach of contract under Count One of the Complaint, all such claims are preempted, and therefore barred, under ERISA because the allegations against GreatBanc relate to an ERISA benefits plan (*i.e.*, the ESOP).

## RESERVATION OF RIGHTS

GreatBanc expressly reserves the right to amend and/or supplement this answer, its defenses and all other pleadings. GreatBanc asserts all defenses that may be revealed during the course of discovery or other investigation.

## DEMAND FOR JURY TRIAL

GreatBanc hereby demands a trial by jury on all claims so triable.

## DESIGNATION OF PLACE OF TRIAL

GreatBanc hereby designates the place for trial in Kansas City, Kansas.

Dated:  June 17, 2020

                                                  Respectfully submitted,

*Of Counsel:*                                     SHOOK, HARDY & BACON L.L.P.

AKERMAN LLP                                       By:  */s/ Todd W. Ruskamp*
Mark S. Bernstein (*pro hac vice* to be filed)         Todd W. Ruskamp, D.Kan #70412
Shawn M. Taylor (*pro hac vice* to be filed)           Jessica A.E. McKinney, D.Kan #78649
Benjamin N. Prager (*pro hac vice* to be filed)

                                                  2555 Grand Boulevard
71 South Wacker Drive, 47th Floor                 Kansas City, Missouri 64108
Chicago, IL 60606                                 Telephone: 816.474.6550
Telephone: 312-634-5700                           Facsimile: 816.421.5547
Facsimile: 312-424-1900                           Email: truskamp@shb.com
Email: mark.bernstein@akerman.com                        jamckinney@shb.com
       shawn.taylor@akerman.com
       ben.prager@akerman.com                     *Attorneys for Defendant GreatBanc Trust*
                                                  *Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2020, I electronically filed the foregoing with the Court by using the Court's electronic filing system, which sent out notification of such filing to all counsel of record.

                                                   */s/ Todd W. Ruskamp*
                                                  *Attorney for Defendant GreatBanc Trust*
                                                  *Company*