# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| FERRELL COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:20-cv-02229-JTM-KGG |
| | ) | |
| GREATBANC TRUST COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT GREATBANC TRUST COMPANY'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL

This discovery dispute stems from Plaintiff Ferrell Companies, Inc.'s refusal to produce documents relating to an issue that is directly mentioned more than twenty times in the Complaint (Dkt. 1 at 2-3 and ¶¶ 14-19, 24.), that is at the heart of the claims and defenses in this case, that is recognized as a subject of discovery in the parties' initial disclosures and Report of Parties' Planning Conference, and that is the subject of Ferrell's own discovery requests to GreatBanc, which GreatBanc agreed to produce. Yet, when GreatBanc requested that Ferrell produce discovery on the issue, Ferrell suddenly decided it was irrelevant, stating the allegations relate to background or motive that Ferrell "does not require . . . to prove its case," and suggesting it would strike these allegations from its own Complaint. Discovery is not a one-way street: its scope is set by the Federal Rules, not by Ferrell's chosen litigation strategy.

As shown below, the discovery at issue falls well-within the scope of Fed. R. Civ. P. 26(b). The Court should grant the Motion to Compel and order Ferrell to produce the requested discovery. In addition, because Ferrell's position is not "substantially justified," GreatBanc respectfully requests that the Court award GreatBanc reasonable expenses incurred for bringing the Motion. *See* Fed. R. Civ. P. 37(a)(5)(A).

## I.     PERTINENT BACKGROUND

The disputed requests seek discovery in connection with Bridger Logistics, LLC and its subsidiaries (collectively, "Bridger"), which Ferrellgas acquired in June 2015.[1] Bridger soon failed and turned into a huge loss for Ferrellgas, a loss that was made exponentially worse by Ferrellgas' Board and upper management and that culminated in two Ferrellgas entities filing Chapter 11 bankruptcies in January 2021. Bridger—and particularly Ferrellgas' ongoing efforts to externalize blame for its failure—rests at the heart of the claims and defenses in this case.

### A.     Overview of Bridger-Related Allegations and Discovery Requests.

The Complaint (Dkt. 1) alleges that GreatBanc, as trustee of the Ferrell Employee Stock Ownership Plan ("ESOP" or "Plan"), orchestrated a "scheme" with "a cadre of powerful banks, investment firms, hedge funds, and their advisors," as well as Ferrellgas' bondholders, lenders, former executives, former attorneys, and other law firms. (Dkt. 1 at 2, 4-5 and ¶ 18.)[2] Ferrell contends that this diverse group of professionals collaborated in an "attempt to take over Ferrellgas" and "hijack[]" the Board. (Dkt. 1 at 2, 4-5, and ¶ 45.) This "scheme," according to Ferrell, stemmed from Ferrellgas' severe financial distress caused by Bridger's acquisition and failure. (*E.g.*, *id.* at 2-5 and ¶¶ 15-18, 20, 24, 31, 33.)

#### 1.   Ferrell Uses Bridger as a Basis for Its Claims Against GreatBanc.

Ferrell asserts claims for breach of contract (Count I) and breach of fiduciary duty under ERISA (Count II) based on GreatBanc's participation in the alleged "scheme." (*See* Dkt. 1 at ¶¶ 38-46.) The Complaint attempts to use GreatBanc's work on the Bridger acquisition and Bridger's

---

[1]     For purposes of this Memorandum, "Ferrell" refers to Plaintiff Ferrell Companies, Inc., "Bridger" collectively refers to Bridger Logistics and its subsidiaries acquired by Ferrellgas, and "Ferrellgas" refers to the corporate entities under the "Ferrellgas" umbrella, including Ferrell, Ferrellgas, L.P., Ferrellgas Partners, L.P., Ferrellgas, Inc., and Bridger, all of which are controlled by the same Board of Directors that also serves as the Plan Administrator to the ESOP.

[2]     Page citations to ECF-filed documents refer to the ECF-stamped page numbers of such documents.

2

subsequent failure as a springboard to support Ferrell's asserted claims and attack GreatBanc's integrity. For example, the Complaint alleges the following:

- "GreatBanc itself understood full well the reason for Ferrellgas' financially challenged position that ostensibly precipitated GreatBanc's improper activist efforts to take over the company. . . . Ferrellgas entered into a special engagement with GreatBanc (beyond the scope of its Directed Trustee role and duties) for GreatBanc to evaluate and exercise its 'fiduciary judgment' with respect to the Bridger transaction, and studied that transaction." (Dkt. 1 at 2-3.)

- "GreatBanc was asked to independently assess the Bridger transaction exercising its own fiduciary judgment. For these efforts, GreatBanc requested and was paid a fee of $500,000—ten times its annual compensation as Directed Trustee." (*Id.* at ¶ 15.)

- "After conducting its own review and analysis, GreatBanc independently concluded that the Bridger acquisition was in the best interest of Plan Participants and approved it." (*Id.*)

- "To protect its own hide [after Bridger failed], at the expense of Ferrellgas' employees, GreatBanc was therefore motivated to participate in the hostile takeover efforts of third parties (and preserve its role as Directed Trustee) to avoid liability for its role in the failed Bridger investment." (*Id.* at 3.)

- "As new management worked with the Board on solutions to remedy Ferrellgas' debt burden, GreatBanc, fearing as to its liability in connection with the Bridger acquisition, began to interfere." (*Id.* at ¶ 18.)

- "[I]n August 2018, [now dismissed defendant] Houlihan Lokey made a play to become financial advisor to Ferrellgas in connection with Ferrellgas' attempts to recover from the failed Bridger acquisition. . . . However, after Houlihan Lokey was not chosen to be Ferrellgas' financial advisor, it turned around and began surreptitiously working with GreatBanc." (*Id.* at ¶¶ 19-20.)

- "[By July 2019], GreatBanc knew that the Ferrell Companies and FGI Boards had retained experienced financial advisors and had appropriately and reasonably exercised their business judgment by adopting long-term strategic objectives to address the balance sheet issues caused by the failed Bridger acquisition[.]" (*Id.* at ¶ 24.)

- "Watching intently, powerful financial institutions (including but also in addition to Houlihan Lokey) found in GreatBanc a useful collaborator to try to appropriate the value of Ferrellgas for themselves. GreatBanc was afraid not only of its loss of position, but also the potential that a new Trustee would examine, and seek legal redress for, its prior actions." (*Id.* at ¶ 31.)

The above allegations represent a fraction of the Complaint's direct references to Bridger. And even where it's not explicitly mentioned, Bridger lurks behind nearly every allegation in the Complaint, including those relating to GreatBanc's communications with the Board and Ferrellgas' financial struggles and restructuring efforts.

## 2. Both Parties Recognize Bridger's Relevance.

Against this backdrop, it's not surprising that Ferrell and GreatBanc have both recognized the relevance of Bridger-related discovery to this case. First, both parties disclosed Bridger as a subject of discovery in their initial disclosures under Rule 26(a)(1)(A)(i) and (ii).[3] Second, both parties identified Bridger as a subject on which "[d]iscovery is needed" in the Report of Parties' Planning Conference.[4] Third, before GreatBanc served the requests at issue here, Ferrell served requests seeking Bridger-related discovery from GreatBanc, namely "[a]ll documents and communications related to Ferrellgas' acquisition of Bridger Logistics, LLC," which GreatBanc agreed to produce without objection.[5] Fourth, GreatBanc's First Set of Requests for Production ("First Requests"), a copy of which is attached hereto as Exhibit A, seek Bridger-related discovery from Ferrell (Exh. A at Requests 10-14) (collectively, "Bridger Requests").

More specifically, the Bridger Requests seek documents and communications for the time period January 1, 2015 to the present that refer or relate to: (i) analysis and due diligence on the Bridger transaction (Request 10); (ii) the "confluence of factors [that] resulted in Bridger's failure" (Request 11); (iii) actual or alleged breaches of the Eddystone Agreement [*i.e.*, Rail

---

[3]     Ferrell's Rule 26(a) Initial Disclosures, at 2-8; GreatBanc's Rule 26(a) Initial Disclosures, at 2-15. Ferrell's counsel emailed the parties' initial disclosures to the Court on November 3, 2020.

[4]     Report on Parties' Planning Conference, at 4-5, § 5(a). Ferrell's counsel emailed this Report to the Court on November 2, 2020.

[5]     GreatBanc's Responses to Ferrell's First Set of Requests for Production, Dec. 2, 2020, at Response 11. Indeed, GreatBanc has already produced hundreds of documents relating to Bridger and more will be included in its upcoming final production.

Services Agreement] between Bridger Transfer and Eddystone (Request 12); (iv) the sale of Bridger Transfer and disposition of its assets, including documents subject to the crime-fraud ruling in the Eddystone Litigation (Request 13); and (v) the suspension, cancelation, or termination of any contracts between Bridger and its largest customer [*i.e.*, Monroe Energy] (Request 14). (*See* Exh. A at Instr. I and Requests 10-14.)

### 3. Ferrell Refuses to Produce Discovery for the Bridger Requests.

Despite previously recognizing Bridger's relevance and requesting Bridger discovery from GreatBanc, Ferrell's Initial Responses to the First Requests, attached hereto as <u>Exhibit B</u>, asserted the following objections to each of the Bridger Requests:

> Ferrellgas objects to this Request as unduly burdensome and not proportional to the needs of this case insofar as the information sought has no relationship to the claims or defenses at issue in this litigation. Ferrellgas also objects to this Request to the extent it seeks information protected by the attorney-client privilege and/or the work product doctrine.

(Exh. B at Responses 10-14.)

Ferrell's Amended Responses, attached hereto as <u>Exhibit C</u>, assert the same objections to the Bridger Requests as the Initial Responses, but tacked on the following two sentences:

> While Ferrellgas realizes that it has alleged GreatBanc's involvement in the Bridger Transaction to be GreatBanc's motive for its improper actions, GreatBanc's motive is not actually relevant to the case. Therefore, Ferrellgas will strike the Bridger-related allegations from its Complaint.

(Exh. C at Responses 10-14.)

After multiple correspondence from GreatBanc's counsel, copies of which are attached hereto as <u>Exhibit D</u>, <u>Exhibit E</u>, <u>Exhibit F</u>, and <u>Exhibit G</u>, and two meet and confers, during which Ferrell's counsel dismissed the Bridger allegations as mere "background," Ferrell's counsel sent a letter, attached hereto as <u>Exhibit H</u>, offering another explanation for Ferrell's position:

Ferrellgas' position is that the Bridger transaction is not relevant to this lawsuit, and **Ferrellgas does not require any documents related to the Bridger transaction to prove its case**. . . . Ferrellgas stands by its objections, and will not produce documents in response to these Requests.

(Exh. H at 1-2) (emphasis added).

Thus, Ferrell has attempted to support its relevance objections to the Bridger Requests on the following grounds: (i) the Bridger allegations go towards GreatBanc's "motive," which, according to Ferrell, "is not actually relevant to the case," (ii) the Bridger allegations are merely "background" information, and (iii) Ferrell "does not require any documents related to the Bridger transaction to prove its case." (Exh. C at Responses 10-14; Exh. E at 3; Exh. H at 1-2.) As further shown below, GreatBanc believes the Bridger Requests seek discovery that will undermine Ferrell's claims and support GreatBanc's defenses in this case, including its First Affirmative Defense based on breaches of fiduciary duty and mismanagement by Ferrell and the Board. (*See* Dkt. 52 at First Aff. Def., ¶¶ 1-9.)

### B.     Further Details Surrounding the Bridger Acquisition.

The origins of Ferrellgas' financial distress trace back to June 2015, when it acquired Bridger for the "price tag" of $822 million. (Dkt. 1 at 2-3 and ¶¶ 14-17.)[6] As Ferrell puts it, "Ferrellgas' then-management" identified Bridger as an "acquisition target" that provided opportunities to "diversify [Ferrellgas'] revenue streams" and reap the benefits of "what then-

---

[6]     In addition to pleadings and discovery served in this case, the remaining background sections in this Memorandum cite information from the following sources: (i) filings from prior litigation between the parties, (ii) filings from other Ferrellgas litigation, (iii) Ferrellgas' filings with the SEC, and (iv) Ferrellgas' website. The Court may take judicial notice of this material. *See Tal v. Hogan*, 453 F.3d 1244, 1265 (10th Cir. 2006) (noting courts may "'take judicial notice of [their] own files and records, as well as facts which are a matter of public record'") (citation omitted); *Columbian Fin. Corp. v. Bowman*, 314 F. Supp. 3d 1113, 1119-20 (D. Kan. 2018) (taking judicial notice of "the existence and content of the orders and pleadings submitted and publicly filed [in this and other proceedings] and take note of the content of what was argued and what was decided") (citation omitted); *Marten Transp., Ltd. v. PlattForm Advert., Inc.*, 2016 WL 1718862, at *3 (D. Kan. Apr. 29, 2016) (taking judicial notice of material on defendant's website) (citing cases); *Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 931 (D. Kan. 2014) ("A court may take judicial notice of the SEC's filings because they are a matter of public record.").

management believed and promoted as a low-risk contract structure." (*Id.* at ¶ 14.) Before Ferrellgas financed the acquisition, "numerous financial institutions, including the underwriter of the bond debt, conducted their own due diligence and concluded the financing of the acquisition was sound." (*Id.* at ¶ 16.) At Ferrell's request, GreatBanc assessed the transaction on behalf of the ESOP under the Seventh Amendment to the Trustee Agreement, which is an exhibit to the Complaint. (*Id.* at ¶ 15; Dkt. 1-3 at 2-3.) After conducting due diligence, GreatBanc "did not object to the [Board] moving forward with the transaction" (Dkt. 52 at ¶ 15).

### C.   <u>Further Details Surrounding Bridger's Failure.</u>

"Within a year [of the acquisition], however, Bridger failed, and Ferrellgas ultimately was forced to take an $800 million write-down[.]" (Dkt. 1 at 3.) This, according to Ferrell, was "the event that put Ferrellgas in the precarious financial position it found itself in 2018-2019." (*Id.*) In reality, Ferrellgas has been in a precarious financial position since the end of 2015. Ferrellgas began shedding its Bridger operations within months of the acquisition, starting with its "sale" of Bridger Transfer Services, LLC ("Bridger Transfer") in early 2016, which, as discussed below, resulted in ongoing litigation involving fraud-based claims against Ferrellgas. Within eighteen months of the acquisition, the stock price of Ferrellgas' publicly traded entity, Ferrellgas Partners, L.P. ("FGP"), fell by 70%, dropping from $23.12/share on June 24, 2015 to $6.77/share on December 30, 2016. In September 2016, Chairman James Ferrell – who has been on the Board since 1984 – returned as CEO, a move allegedly prompted by Bridger's failure and the resulting need to restructure Ferrellgas' substantial debt. (*See* Dkt. 1 at ¶¶ 7, 17.) By November 8, 2019, *i.e.*, GreatBanc's last day as ESOP trustee, FGP's stock was priced at $0.57/share and Ferrellgas' capital structure included $2.2 billion in debt. (Dkt. 52 at First Aff. Def., ¶ 3.)[7]

---

[7]     Information regarding FGP's stock price is publicly available on Ferrellgas' website, s*ee* https://www.ferrellgas.com/our-company/investor-information/stock-price/.

While Ferrell uses Bridger's failure as a basis for asserting claims against GreatBanc, it does not explain the "confluence of factors [that] resulted in Bridger's failure." (Dkt. 1 at ¶ 17.) In its Second Amended Interrogatory Responses, attached hereto as <u>Exhibit I</u>, Ferrell states these factors are "described in Ferrellgas' public filings" and cites, as an example, page 10 of the Form 10-K Ferrellgas filed in 2016. (Exh. I at Interr Resp. No. 8.) That disclosure attributes the failure to the loss of Bridger's largest revenue generating customer and related agreements – which accounted for approximately 60% of Bridger's gross margin and 80% of its EBITDA.[8]

As events would soon show, bad decisions by Ferrellgas' Board and upper management in the wake of this loss resulted in Ferrellgas being sued by Eddystone Rail Company ("Eddystone") in February 2017, *see Eddystone Rail Co., LLC v. Bridger Logistics, LLC et al.*, No. 2:17-cv-00495 (E.D. Pa.) ("Eddystone Litigation"). (A copy of Eddystone's first amended complaint is attached hereto as <u>Exhibit J</u>.) Details surrounding the still-pending Eddystone Litigation shed further light on the relevance of the Bridger Requests.[9]

### 1.  The Arrangement Between Bridger and Eddystone.

At the time of the acquisition, Bridger Transfer, one of the Bridger subsidiaries acquired by Ferrellgas, had a contract with Eddystone ("Eddystone Agreement") under which Bridger Transfer would bring a monthly minimum volume of oil barrels to Eddystone's transloading facility through June 2019, paying Eddystone a set amount per barrel. (Exh. J at ¶¶ 3, 37.) If Bridger Transfer failed to meet its monthly minimum, it would make a deficiency payment to

---

[8]      SEC Form 10-K, Sept. 28, 2016, at 10. *See* https://ferrellgas.gcs-web.com/node/11936/html

[9]      Bridger's acquisition and failure resulted in other lawsuits against Ferrellgas and members of the Board, including actions for securities fraud. *See Hansen v. Ferrellgas Partners, L.P. et al.*, No. 1:16-cv-07840-RJS (S.D.N.Y.); *Pierce v. James Ferrell et al.*, No. 2:17-cv-02160-JWL-GEB (D. Kan.).

Eddystone for each barrel short of the commitment. (*Id.* at ¶ 37.) Ferrellgas and Bridger Logistics covered Bridger Transfer's payment obligations to Eddystone. (*See id.* at ¶¶ 49, 47-58, 65.)

Ferrellgas believed there was little risk of deficiency payments because Bridger Logistics used Eddystone's facility to transport oil to Bridger's largest customer, which had supply requirements that essentially covered Bridger Transfer's monthly commitment to Eddystone. (*Id.* at ¶¶ 37-40.) But oil prices dropped in late 2015 and early 2016, making the agreements with Bridger's largest customer unprofitable. (*Id.* at ¶¶ 61, 64.) On February 1, 2016, those agreements were suspended and then terminated shortly thereafter. (*Id.* at ¶¶ 70-71.)

### 2. Ferrellgas Rids Itself of Bridger Transfer.

The loss of Bridger's largest customer left Bridger Transfer unable to meet its monthly commitment to Eddystone, making Bridger Transfer an increasing liability to Ferrellgas. To rid itself of this liability, Ferrellgas sold Bridger Transfer for ten (10) dollars to a related party – *i.e.*, one of Bridger's founders – who renamed it Jamex Transfer Services, LLC ("Jamex Transfer"). (Exh. J at ¶¶ 73-75.) The purchase agreement for the sale had an effective date of February 1, 2016, *i.e.*, the same day services to Bridger's largest customer were suspended. (*Id.* at ¶ 72.) By the time of the sale, Bridger Transfer's only "asset" was the Eddystone Agreement, which was a liability growing by the day. (*Id.* at ¶¶ 8, 64-66, 72-73.) Yet, roughly one year before the sale, Bridger represented to Eddystone that Bridger Transfer had $98.1 million in total assets, which did not include the value of the Eddystone Agreement. (*Id.* at ¶¶ 42, 73.)

None of this, however, dissuaded Ferrellgas from continuing to tout Bridger. For example, in a March 10, 2016 press release, Ferrellgas' then-CEO stated that "Bridger continues to exceed our expectations" and touted "the strength of Bridger's customer relationships."[10]

---

[10]    Ferrellgas Partners, L.P. Press Release, Mar. 10, 2016, http://www.ferrellgas.com/our-company/investor-information/press-releases/.

### 3.   The Eddystone Litigation and Crime-Fraud Ruling Against Ferrellgas.

In April 2016, Eddystone filed arbitration against Jamex Transfer (f/k/a Bridger Transfer) for defaults under the Eddystone Agreement, which was likely in default at the time of Bridger Transfer's sale. (Exh. J at ¶¶ 74-75.) Eddystone and Jamex Transfer settled the arbitration in January 2017, with Jamex Transfer admitting defaults and consenting to entry of an award against it for ~$140 million. (*Id.*)[11] The next month, Eddystone filed suit against multiple Ferrellgas entities, including FGP, Ferrellgas, L.P., and Bridger Logistics, asserting claims for fraudulent transfers and alter ego liability, among others. (*Id.* ¶¶ 76-98.) Eddystone seeks to collect at least the amount of its award against Jamex Transfer, an entity related to Ferrellgas and owned by a Bridger founder. (*Id.* at ¶¶ 8-10, 89-90.)

Eddystone's allegations shed light on the anomalies surrounding the sale of Bridger Transfer. In the months before the sale, Ferrellgas hatched a plan to drain Bridger Transfer of its assets. Among other things, Ferrellgas (i) retained payments that should have gone to Bridger Transfer and redirected them to other Ferrellgas entities and (ii) stripped Bridger Transfer of its assets and redistributed them to other Ferrellgas entities. (*Eg.*, Exh. J at ¶¶ 8, 64-69, 71-73.)

In October 2018, Eddystone filed a motion to compel under the crime-fraud exception, arguing Ferrellgas' sale of Bridger Transfer was a fraudulent transfer orchestrated by Ferrellgas' in-house and outside counsel to avoid contractual liability.[12] As shown in the June 2019 order, attached hereto as <u>Exhibit K</u>, the court considered the parties' briefing, heard oral arguments, conducted an *in camera* review, and then granted Eddystone's motion, finding "the crime-fraud

---

[11]       *See also* Petition to Confirm Arbitration Award, Feb. 17, 2017, Dkt. 1, at ¶¶ 6-10, *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, No. 1:17-cv-01266-WHP (S.D.N.Y.).

[12]       Plaintiff Eddystone Rail Company's Mot. to Compel Production of Withheld Documents Under the Crime-Fraud Exception, Oct. 12, 2018, Dkt. 217 at 5-6, *Eddystone Rail Co., LLC v. Bridger Logistics, LLC et al.*, No. 2:17-cv-00495 (E.D. Pa.).

exception applies to extinguish the attorney-client privilege and work product privilege." (Exh. K at 1-2.) Thereafter, Ferrellgas filed a petition for writ of mandamus with the U.S. Court of Appeals for the Third Circuit, seeking an order to dismiss the Eddystone Litigation for lack of subject matter jurisdiction or, in the alternative, to vacate the district court's crime-fraud ruling.[13] As shown in the order attached hereto as <u>Exhibit L</u>, the Third Circuit denied Ferrellgas' petition in late September 2019.[14]

The Board's fear of Ferrellgas' significant liability in the Eddystone Litigation likely explains why Eddystone is named as one of the many "players involved in [the] underhanded scheme" Ferrell alleges in this case. (Dkt. 1 at 4-5.)

### D.     **GreatBanc's Removal and Prior Litigation with Ferrell.**

As the effects of Bridger's failure and the Eddystone Litigation reverberated throughout Ferrellgas, GreatBanc was increasingly concerned about Ferrellgas' stock price, overleveraged balance sheets, and financial exposure, all of which threatened the ESOP's interests. (*E.g.*, Dkt. 52-4 at 2-4) (expressing GreatBanc's concerns over Ferrellgas' debt, declining stock price, and $140 million exposure in ongoing litigation, among other things). GreatBanc took steps to protect the ESOP and mitigate further damage to the Plan. The Board, likely concerned with its exposure in the Eddystone Litigation, reacted to GreatBanc's efforts with suspicion and hostility.

In July 2019, GreatBanc requested that the Board form a special committee to consider various recapitalization plans aimed at addressing Ferrellgas' deteriorating financial condition and preserving the ESOP's value. (Dkt. 1 at ¶ 22; Dkt. 52 at First Aff. Def., ¶ 4.) In GreatBanc's

---

[13]     Petition for Writ of Mandamus, Sept. 10, 2019, Doc. No. 003113346251 at 49-50, *In re Bridger Logistics, LLC, Ferrellgas, L.P., and Ferrellgas Partners, L.P.*, No. 19-2678 (3d Cir.).

[14]     The Third Circuit has previously granted mandamus relief on a petition that challenged a ruling under the crime-fraud exception. *See Haines v. Liggett Group, Inc*., 975 F. 2d 81, 98 (3d Cir. 1992) (vacating order that granted a motion under the crime-fraud exception).

view, the Board, which acted as the Plan Administrator and oversaw Ferrellgas' corporate governance (Dkt. 1 at ¶¶ 8-9), had grown entrenched, conflicted, and unable or unwilling to protect the ESOP (Dkt. 52 at First Aff. Def. ¶¶ 2, 4). Thus, GreatBanc also proposed names of various individuals who could serve as independent directors. (*Id.* at ¶ 4.)

The Board summarily rejected GreatBanc's requests and refused to consider recapitalization proposals that GreatBanc sent to it. (Dkt. 52 at First Aff. Def., ¶ 5.) Despite the fact that the ESOP's interests would be impacted by Ferrellgas' restructuring, the Board also refused to share details regarding the restructuring plans, proposals, or strategies that was actually considering and/or implementing. (*Id.*) For example, in correspondence with GreatBanc in the summer of 2019, Ferrellgas stated the Board had adopted "long-term strategic initiatives," but refused to explain what those initiatives were. (Dkt. 1-6 at 2; Dkt. 52-2 at 3.) In other words, the Board froze GreatBanc out of discussions that would determine the fate of Ferrellgas and the ESOP, leaving GreatBanc to face the prospect of carrying out its duties in an informational vacuum intentionally created by its co-fiduciary, the Board. (Dkt. 52 at First Aff. Def., ¶ 5.) The Board soon took more formal action designed to undercut GreatBanc's ability to protect the ESOP. (*Id.* at ¶ 6.) In late July 2019, Ferrell and the Board executed a Plan amendment, with an effective date of August 1, 2018, purporting to require that GreatBanc, in all instances, vote the ESOP shares as directed by the Board, as Plan Administrator. (Dkt. 1 at ¶ 8; Dkt. 1-1 at 53-54.) All of this occurred in the wake of the crime-fraud ruling in the Eddystone Litigation.

On September 10, 2019, GreatBanc's counsel sent Ferrell's counsel a letter expressing concern about the Board's unwillingness to share information regarding its "long-term strategic objectives" and refusal to consider the proposed plan GreatBanc had previously sent it. (Dkt. 52-3.) GreatBanc, therefore, requested to meet with the Board "as soon as possible [that] month."

(*Id.*) Two days later, certain members of the Board and upper management, including James Ferrell and Ferrellgas' general counsel, interviewed a successor trustee and "agreed to recommend" that the Board approve him as GreatBanc's replacement.[15]

On October 9, 2019, Ferrell "sent a Notice of Removal to GreatBanc providing GreatBanc 30 days' notice of its removal." (Dkt. 1 at ¶ 29.) GreatBanc, alarmed by the Board's stonewalling, impulsiveness, and lack of concern for the ESOP, made a Request for Direction two weeks later, requesting that Ferrell "provide a direction to GreatBanc to remove the entire Board of Directors of [Ferrell]" and install a slate of new, well-qualified, and independent directors. (*See* Dkt. 52 at First Aff. Def., ¶ 8; Dkt. 52-4 at 4.) Otherwise, GreatBanc was "prepared to immediately move forward and replace the Board without direction." (Dkt. 52-4 at 4.)

Ferrell filed its first lawsuit against GreatBanc one day after GreatBanc's Request for Direction, *see Ferrell Companies, Inc. v. GreatBanc Trust Company*, No. 2:19-cv-02656-JAR-GEB (D. Kan.) ("Prior Action"). Ultimately, GreatBanc stepped down as trustee on November 8, 2019, without replacing the Board, and the Prior Action was dismissed pursuant to a settlement. (Dkt. 52 at First Aff. Def., ¶ 8.) The parties entered a stipulation of dismissal in the Prior Action pursuant to their settlement, stating, in part: "[e]ach party shall bear its respective attorneys' fees, costs, and expenses incurred in this litigation." (Dkt. 52-5.) Nevertheless, Ferrell filed this second action against GreatBanc, claiming its legal fees and costs from the Prior Action as damages. (Dkt. 1 at ¶¶ 37, 40.)

**E.      Events After Removal: Delisting of FGP's Stock and Filing Bankruptcy.**

On January 10, 2020, Ferrellgas delisted FGP's stock from the NYSE. (Dkt. 52 at First Aff. Def., ¶ 3.) One year later, on January 11, 2021, FGP and Ferrellgas Partners Finance Corp.,

---

[15]      Declaration of Cathy Brown, Nov. 6, 2019, Dkt. 19-14, at ¶ 3, *Ferrell Companies, Inc. v. GreatBanc Trust Company*, No. 2:19-cv-02656-JAR-GEB (D. Kan.).

the co-issuer and co-obligor for FGP's debt, filed prepackaged Chapter 11 bankruptcies, *In re Ferrellgas Partners, L.P. and Ferrellgas Partners Finance Corp.*, No. 21-10021 (MFW) (Bankr. D. Del.). The disclosure statement for the Chapter 11 plan includes a section on "Events Leading to Chapter 11 Filing," with the first subsection titled: "The Bridger Acquisition and Eddystone Litigation."[16]

The Chapter 11 plan provides for the ESOP's dilution and impairment, which is a scenario GreatBanc sought to avoid before the Board removed it as the ESOP trustee.[17] For example, in November 2018, GreatBanc was contacted by certain members of Ferrellgas' senior management, who expressed concerns about the Board's leadership and Ferrellgas being pushed into bankruptcy. (Dkt. 52-4 at 3.) GreatBanc met with the Board the following month to discuss GreatBanc's concerns, by which time the Ferrellgas managers who brought their concerns to GreatBanc had been removed from their positions. (*See id.*) During that meeting, the Board acknowledged that Ferrellgas had "too much debt" and assured GreatBanc that the Board was working to address the problem, though it refused to provide specifics. (*Id.*) According to James Ferrell's declaration in the Prior Action, a copy of which is attached as <u>Exhibit M</u>, Mr. Ferrell made three trips to GreatBanc's office in Chicago in early 2019, reassuring GreatBanc that "allegations that [he] planned to take the company into bankruptcy was concocted out of thin air." (Exh. M at ¶ 21.)

---

[16]     First Amended Disclosure Statement Relating to the First Amended Prepackaged Joint Chapter 11 Plan of Reorganization, Feb. 5, 2021, Dkt. 123, at 38-40, *In re Ferrellgas Partners, L.P. and Ferrellgas Partners Finance Corp.*, No. 21-10021 (MFW) (Bankr. D. Del.).

[17]     *E.g.*, Second Amended Prepackaged Joint Chapter 11 Plan of Reorganization of Ferrellgas Partners, L.P. and Ferrellgas Partners Finance Corp., Feb. 26, 2021, Dkt. 174 at 28-29, § 3.04(iv), *In re Ferrellgas Partners, L.P. and Ferrellgas Partners Finance Corp.*, No. 21-10021 (MFW) (Bankr. D. Del.) (indicating Class 4 noteholders to receive New Class B Units); *id.* at 30-31, § 3.04(x) (indicating "Class 10 – Existing LP Units Interests" will be impaired and "subject to dilution by the New Class A Units issued upon any future conversion of the New Class B Units").

## II.   <u>ARGUMENT</u>

### A.   <u>Applicable Legal Standards.</u>

Under Fed. R. Civ. 26(b), "requested information must be nonprivileged, relevant, and proportional to the needs of the case to be discoverable." *Isberner v. Walmart, Inc.*, No. 20-2001-JAR-KGG, 2020 WL 6044097, at *1 (Gale, Mag. J.) (D. Kan. Oct. 13, 2020). "Relevance is to be 'broadly construed at the discovery stage of the litigation and a request for discovery should be considered relevant if there is any possibility the information sought may be relevant to the subject matter of the action.'" *Assessment Techs. Inst., LLC v. Parkes*, No. 19-2514-JAR-KGG, 2021 WL 122845, at *3 (Gale, Mag. J.) (D. Kan. Jan. 13, 2021) (citation omitted). "Stated another way, 'discovery should ordinarily be allowed unless it is clear that the information sought can have no possible bearing on the subject matter of the action.'" *AKH Co. v. Universal Underwriters Ins. Co.*, No. 13-2003-JAR-KGG, 2015 WL 4523578, at *2 (Gale, Mag. J.) (D. Kan. July 27, 2015) (citation omitted). *See also Atl. Specialty Ins. Co. v. Midwest Crane Repair, LLC*, No. 20-4013-JAR-ADM, 2020 WL 5118067, at *1 (D. Kan. Aug. 31, 2020) ("Relevance is 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (citations omitted).

"Unless a discovery request is facially objectionable, the party resisting discovery has the burden to support its objections." *Ezfauxdecor, LLC v. Smith*, No. 15-9140-CM-KGG, 2017 WL 2721489, at *2 (Gale, Mag. J.) (D. Kan. June 23, 2017). That burden cannot be met with conclusory, boilerplate objections to discovery requests. *Id.* "'Instead, the party resisting discovery must show specifically how each discovery request is irrelevant, immaterial, unduly burdensome or overly broad.'" *Id.* (citation omitted).

15

B.    **The Bridger Requests Seek Relevant Information.**

The Bridger Requests are relevant to the claims and defenses in this case. Indeed, although the standard for relevance is different at the trial stage, it's impossible to imagine how the merits of this case can ultimately be weighed and decided without evidence relating to Bridger.

First, Bridger underlies Ferrell's allegations that GreatBanc and multiple third parties schemed to takeover Ferrellgas and "hijack" the Board. Among other things, the Complaint makes allegations relating to GreatBanc's work on the Bridger acquisition (Dkt. 1 at 2-3 and ¶ 15), which it uses as a basis for alleging GreatBanc's involvement in the purported scheme. (Dkt. 1 at 2) ("GreatBanc itself understood full well the reason for Ferrellgas' financially challenged position that ostensibly precipitated GreatBanc's improper activist efforts to take over the company"); *id.* at 3 ("To protect its own hide . . . GreatBanc was therefore motivated to participate in the hostile takeover efforts of third parties (and preserve its role as Directed Trustee) to avoid liability for its role in the failed Bridger investment."); *id.* at ¶ 18 ("As new management worked with the Board on solutions to remedy Ferrellgas' debt burden, GreatBanc, fearing as to its liability in connection with the Bridger acquisition, began to interfere."); *id.* at ¶ 31 ("Watching intently, powerful financial institutions . . . found in GreatBanc a useful collaborator to try to appropriate the value of Ferrellgas for themselves. GreatBanc was afraid not only of its loss of position, but also the potential that a new Trustee would examine, and seek legal redress for, its prior actions.").

Second, GreatBanc believes discovery sought by the Bridger Requests will refute Ferrell's claims and support GreatBanc's defenses, including but not limited to its affirmative defense for breach of fiduciary duty by Ferrell and the Board. (Dkt. 52 at First. Aff. Def., ¶¶ 1-9.) While the drop in oil prices may have contributed to Ferrellgas' loss of expected revenue from Bridger, how did Bridger turn into what James Ferrell described as a "disaster" that had "terrible consequences"

for Ferrellgas? (*See* Exh. M at ¶¶ 11, 12, 15.) GreatBanc believes it was due to decisions and actions by Ferrellgas' Board and upper management. This is evidenced by Ferrellgas' sale of Bridger Transfer and the ensuing Eddystone Litigation, which indicates the sale was a fraudulent scheme executed at the highest levels of Ferrellgas' corporate governance. It is also evidenced by the Board freezing GreatBanc out of discussions and communications that directly impacted the ESOP's interests (*e.g.*, restructuring initiatives) in the midst of the Eddystone Litigation, a decision GreatBanc believes was driven, in whole or in part, by the Board's desire to conceal its misconduct and mismanagement on Bridger. Thus, GreatBanc expects the Bridger Requests will provide further evidence of misconduct and breaches of fiduciary duty by Ferrell and the Board, all of which are relevant to the claims and defenses in this case.

### C. Ferrell's Objections to the Bridger Requests Have No Merit.

While Ferrell objects to the Bridger Requests "as unduly burdensome and not proportional to the needs of this case," the Amended Responses fail to explain the basis for either objection and appear to simply tie them to relevance (*i.e.*, ". . . insofar as the information sought has no relationship to the claims or defenses at issue in this litigation"). (Exh. C at Responses 10-14.) To the extent Ferrell asserts separate objections for undue burden and proportionality, its boilerplate objections are insufficient, not to mention unfounded. *See Seed Research Equip. Sols., LLC v. Gary W. Clem, Inc.*, No. 09-1282-EFM-KGG, 2011 WL 855804, at *2 (Gale, Mag. J.) (D. Kan. Mar. 9, 2011) ("[A] party raising a 'burdensome' objection 'must show not only "undue burden or expense," but also show that the burden or expense is unreasonable in light of the benefits to be secured from the discovery.'"); *Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-CV-1094-JTM-TJJ, 2017 WL 4770702, at *4 (D. Kan. Oct. 19, 2017) ("The party resisting discovery bears the burden to support its objections based upon proportionality[.]").

Ferrell's relevance objection is grounded in its position that Bridger-related allegations bear on GreatBanc's "motive," which the Amended Responses baldly assert "is not actually relevant to the case." (Exh. C at Responses 10-14.) Ferrell has not offered additional details on its relevance objections, other than to describe its allegations as "background" and say that Ferrell "does not require any documents related to the Bridger transaction to prove its case." (*See* Exh. E at 3; Exh. H at 1.) There is no support for Ferrell's positions.

<u>First</u>, the Complaint's Bridger-related allegations are not merely related to "background" or GreatBanc's purported motive: they form the foundation of Ferrell's claims in this case. Nor does Ferrell's self-serving attempt to downplay these allegations narrow the scope of discovery or change the outcome. *See Isberner*, 2020 WL 6044097, at *1; *see also Wildman v. Am. Century Servs., LLC*, 2017 WL 5068516, at **2-3 (W.D. Mo. July 27, 2017) (granting motion to compel in ERISA litigation where plaintiff argued discovery was relevant to show defendants' motivation for allegedly breaching their fiduciary duties of loyalty and prudence); *State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc.*, 2008 WL 11337641, at *4 (M.D. Fla. Oct. 17, 2008) ("A party is entitled to the underlying facts that support the allegations raised in a complaint."). <u>Second</u>, the scope of discovery is determined by the Federal Rules, not by Ferrell's strategy for litigating this case. As discussed above, the Bridger Requests are relevant to Ferrell's claims and to GreatBanc's defenses. Ferrell filed this lawsuit and must now produce this relevant discovery.

### D.     <u>The Court Should Award GreatBanc Reasonable Expenses for the Motion.</u>

GreatBanc made several good-faith efforts to avoid bringing this dispute to the Court. Ferrell, on the other hand, has taken inconsistent positions on Bridger discovery, asserted unfounded objections, and showed no interest in resolving this dispute. As shown above, Ferrell's positions on the Bridger Requests are factually and legally baseless. By any measure, they are not

substantially justified. If the Court grants the Motion to Compel, GreatBanc respectfully requests that the Court order Ferrell to pay reasonable expenses incurred by Greatbanc to make the Motion, including attorney's fees. *See* Fed. R. Civ. P. 37(a)(5)(A). GreatBanc does not make this request lightly, but believes it is warranted given the circumstances surrounding this dispute.

## III.  **CONCLUSION**

For the reasons above, GreatBanc respectfully requests that the Court (i) grant the Motion to Compel and order that Ferrell produce the discovery sought by Requests 10-14 of GreatBanc's First Set of Requests for Production of Documents; (ii) award GreatBanc reasonable expenses incurred in bringing the Motion; and (iii) award any other relief the Court deems just and proper.

Dated:  March 31, 2021

Respectfully submitted,

*Of Counsel:*                                                    SHOOK, HARDY & BACON L.L.P.

AKERMAN LLP                                      By:  */s/ Todd W. Ruskamp*
Mark S. Bernstein (admitted *pro hac vice*)          Todd W. Ruskamp, D.Kan #70412
Shawn M. Taylor (admitted *pro hac vice*)            Jessica A.E. McKinney, D.Kan #78649

71 South Wacker Drive, 47th Floor            2555 Grand Boulevard
Chicago, IL 60606                                      Kansas City, Missouri 64108
Telephone: 312-634-5700                         Telephone: 816-474-6550
Facsimile: 312-424-1900                          Facsimile: 816-421-5547
Email: mark.bernstein@akerman.com        Email: truskamp@shb.com
          shawn.taylor@akerman.com                      jamckinney@shb.com

*Attorneys for Defendant GreatBanc Trust Company*

## LOCAL RULE 37.2 CERTIFICATE OF COMPLIANCE

Pursuant to D. Kan. Local Rule 37.2 and Fed. R. Civ. P. 37, the undersigned counsel certifies that GreatBanc's counsel conferred with Ferrell's counsel in a reasonable and good faith effort to resolve the issues raised in the Motion to Compel. These efforts are referred to in Section I(A)(3) of the above Memorandum and include two telephonic meet and confers between counsel for the parties. The first was held on January 4, 2021 between Shawn Taylor and Benjamin Prager, on behalf of GreatBanc, and Sarah Rathke, on behalf of Ferrell, to discuss Ferrell's Initial Responses, and ran for approximately 35-40 minutes. The second was held on February 8, 2021 between Shawn Taylor, Benjamin Prager, and Todd Ruskamp, on behalf of GreatBanc, and Sarah Rathke and Marques Richeson, on behalf of Ferrell, to discuss Ferrell's Amended Responses, and ran for approximately 50 minutes. The Bridger Requests were discussed during both meet and confers, as well as in written correspondence between counsel for the parties, as reflected in Exhibits D, E, F, G, and H to this Memorandum.[18] The parties acknowledged they were at an impasse on this discovery during their second meet and confer and GreatBanc's counsel  informed Ferrell's counsel that GreatBanc would move to compel on the Bridger Requests and seek reasonable expenses incurred for bringing the motion. (*See* Exh. G at 3.)

 _/s/ Shawn M. Taylor_
*An Attorney for GreatBanc Trust Company*

*/s/ Todd W. Ruskamp*
*An Attorney for GreatBanc Trust Company*

---

[18]     The Court granted GreatBanc's two motions for an extension of time to file its motion to compel under Local Rule 37.1(b) (*see* Dkt. 68 and 73), both of which were filed with Ferrell's consent (*see* Dkt. 66 and 72). Under the second extension, GreatBanc's motion is due on or before March 31, 2021. (Dkt. 73.)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2021, I electronically filed the foregoing with the Court by using the Court's electronic filing system, which sent out notification of such filing to all counsel of record.

_/s/ Todd W. Ruskamp_

*An Attorney for GreatBanc Trust Company*
